Opinion by
ACOBA, J.
We.hold that Petitioner Sierra Club (Petitioner) has not met the three-part “injury-in-fact” test for standing to assert its claim that an environmental assessment (EA) should have been conducted by Respondent Hawai'i Tourism Authority (HTA) prior to its letting of a contract for tourism marketing services. While we are not unsympathetic to the concerns it raises, Petitioner has not established: (1) that it would suffer an actual or threatened injury as a result of the marketing services proposed in the contract; (2) that the alleged or threatened injury is or would be fairly traceable to expenditures for such services; and (3) that such injury, assuming arguendo that it was suffered or threatened, would likely be remedied by a favorable judicial decision. Further, Petitioner’s other bases for standing have no merit because (1) an “informational injury” is insufficient to confer standing; (2) Petitioner has not established a procedural right to protect its concrete interests such that it may rely upon “procedural standing”; and (3) a claim that Petitioner can establish standing with its success on the merits is erroneous because standing must be established at the beginning of a case. Accordingly, we dismiss its petition.
I.
The HTA is charged, pursuant to Hawai'i Revised Statutes (HRS) § 201B-6 (Supp. 2000), with “responsibility] for developing a strategic tourism marketing plan” for the State.[1] In that connection, the HTA prepared a draft marketing plan dated June 29, 1999 called “Ke Kumu Strategic Directions for Hawaii’s Visitor Industry” or the “Tourism Strategic Plan” (draft TSP).[2] The draft *246 TSP described Hawaii’s unique character as a tourism destination and set forth marketing goals for the HTA.
A “Hawaii Tom-ism Product Assessment” report was prepared by KPMG LLP under the direction and guidance of the HTA’s Tom-ism Strategic Plan Committee. KPMG LLP “gathered extensive community-wide input about tourism from four major stakeholder groups: Hawaii visitors, residents, private businesses, and government.” Pricewater-houseCoopers LLP submitted an assessment of the draft TSP, entitled “Comparative Strategic Assessment of Hawaii Tourism Executive Summary” and dated June 29, 1999. PricewaterhouseCoopers utilized the assessment compiled by KPMG LLP and arrived at certain major findings and conclusions.
In a June 30, 1999 press release, the HTA informed the public that community meetings would be held to consider the draft TSP. The press release indicated that copies of the draft TSP and the assessment studies would be available at the HTA’s office, at major libraries throughout the state, and on the HTA’s website. The draft TSP and the two assessment studies were submitted for evaluation at ten public community meetings conducted throughout Hawai'i from July 13 to July 29, 1999. Copies of these documents were also made available to the public at these meetings. Affidavits submitted by Petitioner indicate that its members attended the community meetings and submitted comments and objections.
On August 2, 1999, the HTA issued a request for bids on a “Proposal for Tourism Integrated Marketing Management Services” (the Marketing RFP [ (Request for Proposal procedure) ]). The Marketing RFP solicited “proposals specifically for the overall administration of the marketing services for all specified major market areas (MMAs).”[3] As the “Project Goal,” the Marketing RFP emphasized that the HTA “[was] seeking a vendor to provide management of global Tourism Integrated Marketing Services for the State of Hawai'i[4] that contribute to the goal of an average annual growth rate of approximately ⅛.6% in visitor expenditures through the year 2005.”[5] (Emphasis added.) In that *247 respect, the draft TSP, which was provided to the bidders, reemphasized that
[t]he HTA’s priority is to achieve managed growth of Hawaii’s tom-ism industry by focusing on increasing visitor expenditures. Cognizant of Hawaii’s finite wealth of natural resources, the HTA recognizes that growth in visitor arrivals is secondary to growth in visitor expenditures.
(Emphasis added.)
The Marketing RFP identified seven “Overall Project Goals” for the contractor, as follows:
1. Increase promotional presence and brand identity to more globally competitive levels to optimize performance in each MMA.
2. Structure marketing efforts to stimulate demand during shoulder periods (spring and fall).
3. Develop and execute cooperative programs with travel partners to optimize use of HTA resources for brand marketing.
4. Support TV and film initiatives that provide cost-effective, high-profile exposure through liaison with State and County film offices.
5. Place increased emphasis on U.S. West, U.S. East and Japan.
6. Place sustained emphasis on Europe and Canada.
7. Place developing emphasis on Other Asia, Oceania and Latin America.
(Boldfaced emphases in original and underscored emphases added.) “[A]n annual calendar year budget of approximately $38 million” was set for the contract. The contract was “for a minimum of 3 years with an option to renew to the successful Contractor” and would be “effective January 1, 2000.”
On September 15, 1999, the HTA selected the Hawai'i Visitors and Convention Bureau (HVCB) as the contractor, subject to successful contract negotiations. On February 28, 2000, the HTA and the HVCB executed a contract pursuant to HRS § 201B-12(b) (Supp.2000)[6] (the marketing contract). The marketing contract, effective as of January 1, 2000, provided that $117 million was available to fund the agreement over its term. However, the contract is subject to certain legal conditions. The Marketing RFP provided that the contract “may be terminated during its term at the discretion of the HTA for reasons such as non performance of the Contractor, change in the administration and/or funding for this program, or for the convenience of the state.”
II.
On January 11, 2000, Petitioner filed a petition for declaratory and injunctive relief (Petition) under HRS § 201B-15 (Supp. 2000),[7] which vested this court with original *248 jurisdiction [8] in any action to which the HTA is either a party or in which questions arise as to the validity of any HTA action. The petition challenged the action of the HTA by its Board of Directors and Shari Chang, Chairperson of the Board [hereinafter, collectively, HTA], “in approving the expenditure of $114 million[9] in state funds during the years 2000-2002 for advertising and marketing services without first preparing an [EA] ” under HRS § 343-5(a) (1993).[10] An EA is “a written evaluation to determine whether an action may have a significant effect.” HRS ■§ 343-2 (Supp.2000). The term “significant effect” is defined as
the sum of effects on the quality of the environment, including actions that irrevocably commit a natural resource, curtail the range of beneficial uses of the environment, are contrary to the State’s environmental policies or long-term environmental goals as established by law, or adversely affect the economic welfare, social welfare, or cultural practices of the community and State.
HRS § 343-2. HRS § 343-5(b) (Supp.2000) provides in relevant part that an agency such as the HTA “shall prepare an [EA] for such action at the earliest practicable time to determine whether an environmental impact statement [ (EIS) ] shall be required.” An “EIS” is defined as follows:
9. Although the contract states a payment amount of $117 million, all the subsequent motions and documents filed by the parties indicate the amount as $114 million.
[A]n informational document prepared in compliance with the rules adopted under section 343-6 and which discloses the environmental effects of a proposed action, effects of a proposed action on the economic welfare, social welfare, and cultural practices of the community and State, effects of the economic activities arising out of the proposed action, measures proposed to minimize adverse effects, and alternatives to the action and them environmental effects.
HRS § 343-2.
In its petition, Petitioner claims standing to bring this action because, inter alia, (1) it is a national conservation organization (paragraph 11 of the petition), (2) some of its members reside in areas that will experience alleged adverse impacts (paragraph 12), (3) its members’ interests “encompass a variety of economic, educational, cultural, religious, aesthetic, scientific, environmental, health, and recreational uses of areas directly and indirectly affected by the HTA’s project” (paragraph 13), (4) the expenditure of funds over three years will result in increased tourist travel to the islands (paragraph 34), (5) *249 the HTA’s actions “directly, immediately and adversely affect Petitioner’s organizational interests, and its members’ use and enjoyment of the land, air and waters will be impaired” (paragraph 14), (6) the lack of an EA means the HTA’s “decisions will be uninformed and will adversely affect the Petitioner” (paragraph 15), (7) there is “a risk that serious environmental impacts will be overlooked” (paragraph 16), and (8) “Petitioner has been and will be frustrated in its ability to participate in the debate and decision-making over the [HTAj’s program” (paragraph 17).
Petitioner prayed, among other things, that this court: (1) enter an order declaring that “[the HTA] is ... implementing and expending State funds, in violation of Chapter 343, without the preparation of a required [EA]” and that “[the HTA] is violating one of the ... purposes of HRS Chapter 343 which is to insure that environmental concerns are given appropriate consideration in decision-making”; (2) enter “an Order requiring [the] HTA to prepare an [EA]”; (3) issue “a mandatory injunction” directing the HTA “to abandon the proposed project or to prepai*e an EA”; and (4) impose “a temporary restraining order, preliminary injunction, and permanent injunction against the [HTA],” the expenditure of “any State funds[,] or from selecting'any alternative studies or filing or pursuing applications for approvals, until ... an acceptable EA is prepared[.]”
In its February 16, 2000 answer, the HTA alleged, inter alia, that it was without information or belief as to the truth or falsity of the allegations in paragraphs 11 and 13, denied the allegations in paragraphs 12, 14, 15, 16, 17, and 34, and asserted sixteen other defenses to the petition, including the defense that Petitioner lacked standing.
On March 3, 2000, the HTA filed a motion for summary judgment, in which it contended that an EA was not required before the expenditure of state funds.[11] Petitioner filed its own motion for summary judgment on March 8, 2000. In its motion, Petitioner asserted that it had standing to prosecute this action because (1) its members’ environmental interests were injured in fact or are threatened with injury as claimed in the members’ affidavits attached to its motion and (2) Petitioner suffered “informational injury in fact” and “injury from increased likelihood of an eiToneous decision.” As to injury to the environment, Petitioner’s motion for summary judgment summarized its members’ affidavits as follows:
Each of the Affiants is or may be injured because of the public infrastructural deficits that will be exacerbated. Traffic congestion, particularly moving along roadways well-traveled by visitors, will increase unabated. There has been no demonstration that these islands have the “carrying capacity” to accommodate the increased numbers of visitors proposed by the HTA.
Competition to enjoy Haivai‘i’s precious resources, particularly beaches, will only increase!,] harming recreational interests and causing adverse social impacts. The increase in the number of visitors will increase alien species introductions to Ha-wai'i through its airports[,] causing increased harm to agriculture, agricultural exports, watersheds relied upon for public drinking purposes, eco-systems, parklands, public health and tourism itself.
(Emphases added.) In its March 15, 2000 memorandum in opposition to Petitioner’s motion for summary judgment, the HTA ar *250 gued, inter alia, that Petitioner lacked standing to challenge the HTA’s implementation of the draft TSP and award of the marketing contract.[12]
III.
While we are cognizant of the concerns raised by Petitioner, we hold that Petitioner lacks standing to assert its claims for relief in this case. “Standing is concerned with whether the parties have the right to bring suit.” Mottl v. Miyahira, 95 Hawai'i 381, 388, 23 P.3d 716, 723 (2001) (quoting Pele Defense Fund v. Puna Geothermal Venture, 77 Hawai'i 64, 67, 881 P.2d 1210, 1213 (1994)). “A plaintiff without standing is not entitled to invoke a court’s jurisdiction.” Id. (citing Akinaka v. Disciplinary Bd. of Hawai'i Supreme Court, 91 Hawai'i 51, 55, 979 P.2d 1077, 1081 (1999) (other citations omitted)). Accordingly, Petitioner must establish its standing for this court to exercise jurisdiction over this case. See United Pub. Workers, Local 646 v. Brown, 80 Hawai'i 376, 381, 910 P.2d 147, 152 (App.1996) (stating that “[t]he burden of establishing that the standing requirements have been satisfied rests upon [the union]” in a case where the union appealed a Labor Relations Board decision).
“[T]he crucial inquiry with regard to standing is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his or her invocation of the court’s jurisdiction and to justify exercise of the court’s remedial powers on his or her behalf.” Mottl, 95 Hawai'i at 389, 23 P.3d at 724 (internal quotation marks and citations omitted).
In deciding whether the plaintiff has the requisite interest in the outcome of the litigation, we employ a three-part test: (1) has the plaintiff suffered an actual or threatened injury as a result of the defendant’s ... conduct;[13] (2) is the injury fairly traceable to the defendant’s actions; and (3) would a favorable decision likely provide relief for plaintiffs injury.
Id. (citation omitted) (emphasis added). Since the test is stated in the conjunctive, Petitioner must satisfy all three prongs to establish its standing.[14] It has the burden of proof with respect to the injury-in-fact test: *251 Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations omitted). Because this case proceeded to the summary judgment stage, we may consider the affidavits submitted in support of summary judgment as well as the factual allegations set forth in the petition.
*250 Since [the injury-in-fact elements for standing] are not mere pleading requirements but rather an indispensable part of the plaintiffs case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.... At the pleading stage, general factual allegations of injury resulting from the defendant’s conduct may sufficef.]
*251 In applying this three-part test in cases involving environmental concerns and native Hawaiian rights, this court’s opinions have moved “from ‘legal right’ to ‘injury in fact’ as the ... standard ... for judging whether a plaintiffs stake in a dispute is sufficient to invoke judicial intervention[,]” Life of the Land v. Land Use Comm’n, 63 Haw. 166, 174, 623 P.2d 431, 439 (1981), from “economic harm ... [to inclusion of] ‘[a]esthetic and environmental well-being’ ” as interests deserving of protection, In re Hawaiian Elec. Co., 56 Haw. 260, 265 n. 1, 535 P.2d 1102, 1105 n. 1 (1975) (quoting United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 686, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)), and to the recognition that “a member of the public has standing to ... enforce the rights of the public even though his [or her] injury is not different in kind from the public’s generally, if he [or she] can show that he [or she] has suffered an injury in fact[.]” Akau v. Olohana Corp., 65 Haw. 383, 388, 652 P.2d 1130, 1134 (1982). Thus, while the basis for standing has expanded in cases implicating environmental concerns and native Hawaiian rights, plaintiffs must still satisfy the injury-in-fact test.
IV.
Petitioner’s assertion that an EA should have been prepared is premised on the HTA’s approval of an expenditure of funds for the marketing contract. Insofar as Petitioner claims that the expenditures would result in injury to the environment, the pertinent “conduct” for purposes of applying the injury-in-fact test is the expenditure of funds under the marketing contract, while the actual or threatened injury is that set forth in the affidavits of Petitioner’s members.[15]
In this respect, the first prong of the test Petitioner must satisfy is that it “suffered an actual or threatened injury as a result of the defendants’ conduct[.]” Mottl, 95 Hawai'i at 391, 23 P.3d at 726 (citation omitted). According to Petitioner, the HTA’s funding of the marketing contract will lead to an increase in the number of visitors, which in turn will adversely impact the environment. This allegation requires us to infer that more visitors will come to Hawai'i as a result of the marketing program. However, while Petitioner appears to assume that the project will bring more visitors, the expressed goal of the Marketing RPP was “an average growth rate of approximately 4.6% in visitor expenditures.” (Emphasis added.) “Growth in visitor arrivals” was “secondary” because the HTA “[re]cogniz[ed] ... Hawaii’s finite wealth of natural resources.” It is not evident, then, that the HTA’s marketing program did or would result in an increase in visitor arrivals.
Moreover, Petitioner’s affidavits with respect to traffic congestion and crowded recreation areas lack sufficient specificity to be accepted as factual allegations of injury resulting from the HTA’s conduct. Insofar as the affidavits assert that the persons observed in recreational areas were tourists, the affiants fail to present any facts demonstrating the basis for their conclusions, much less that the presence of such tourists was the result of the HTA’s marketing program.
Similarly, with regard to general laments about increased traffic and use of recreational areas, the affidavits do not establish that such conditions are the result of the HTA’s marketing program, as distinguished from other causes, or of non-tourists. The proposition that an increased introduction of alien species is or will be the result of the marketing program suffers from the same infirmity. *252 Cf. Hawai'i Cmty. Fed. Credit Union v. Keka, 94 Hawai'i 213, 222, 11 P.3d 1, 10 (2000) (“Pursuant to [Hawai'i Rules of Civil Procedure] Rule 56(e), ... affidavits in support of a motion for summary judgment shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.” (Internal quotation marks and citations omitted.)).
Finally, it would appeal- self-evident that tourists visit the state for various reasons— reasons that may be wholly unrelated to the HTA’s expenditures or its marketing program. The affidavits fail to account for the existence of other factors or variables that may in fact be the cause of the injuries claimed.
Accordingly, Petitioner’s claim differs from those in other environmental cases in which the conduct challenged concretely affected or threatened the plaintiffs interests. See Ka Pa'akai O Ka'aina v. Land Use Comm’n, 94 Hawai'i 31, 35-36, 7 P.3d 1068, 1072-73 (2000) (petitioner had standing to challenge land use reclassification to build 530 single family homes, 500 low-rise multi-family units, a 36-hole golf course, an 11-acre commercial center, a 3-acre recreation club, and a golf clubhouse on historic lava flow region assoch ated with native Hawai'ian culture and history, linked to King Kamehameha I, Kameeia-moku, and his twin brother); Mahuiki v. Planning Comm’n, 65 Haw. 506, 515, 654 P.2d 874, 880 (1982) (petitioners, adjacent landowners, had standing to invoke judicial review to challenge “decision to permit the construction of multi-family housing units on undeveloped land in the special management area” because injury was considered “personal” or “special”); Akau, 65 Haw. at 384, 390, 652 P.2d at 1132, 1135 (plaintiffs had standing to bring class action to enforce rights-of-way along once public trails to the beach that crossed defendants’ property because “difficulty in getting to the beach hampers the use and enjoyment of it and may prevent or discourage use in some instances”); Life of the Land v. Land Use Comm’n, 61 Haw. 3, 8, 594 P.2d 1079, 1082 (1979) (plaintiff had standing to challenge development project for which variance or modification was sought to include a high density multiple-family dwelling because “urbanization w[ould] destroy beaches and open space now enjoyed by members and decrease agricultural land presently used for the production of needed food supplies,” where members resided in “immediate vicinity” of construction area); East Diamond Head Ass’n. v. Zoning Bd. of Appeals, 52 Haw. 518, 521-22, 479 P.2d 796, 798-99 (1971) (appellants had standing to challenge movie operation that interfered with the enjoyment of them property because “evidence of an increase in noise, traffic, and congestion ..., inconvenience by electrical and telephone work crews, and a fear that studio’s facilities would permanently remain and detract from the aesthetic residential character of the neighborhood” showed that each appellant was a “person aggrieved”); Dalton v. City and County of Honolulu, 51 Haw. 400, 403, 462 P.2d 199, 202 (1969) (petitioners living across the street from proposed highrise apartment building site had standing because restricted scenic view, limited open space, and increased population in the area created a “concrete interest” in a “legal relation” (internal quotation marks and citation omitted)). Petitioner, then, has not established that the injury—claimed or threatened—resulted or will result from the HTA’s conduct.[16]
V.
Under the second element of the test, Petitioner must establish a causal connection be *253 tween the injury suffered and the action at issue. While Petitioner’s members’ affidavits are replete with complaints, none of the affidavits establish that any purported actual or threatened injury is or would be traceable as a matter of fact to HTA’s expenditure of funds.
The affidavits of Petitioner’s members assume that the expenditure of funds must have resulted or would result in an increased number of tourists who will, in turn, cause injury to them interests. To establish a logical nexus as required by Life of the Land, 68 Haw. at 173 n. 6, 623 P.2d at 439 n. 6, between the expenditure of funds and the injuries alleged, several premises must be accepted, that, is, (1) that the marketing expenditure is for the purpose of persuading visitors to come to Hawai'i, (2) that the visitors’ decision to eome to Hawai'i was a result of the marketing expenditure, (3) that the visitors’ activities in Hawai'i directly affected or will affect a discrete interest that Petitioner has identified, and (4) that the visitors have adversely affected or will adversely affect that interest. But factual allegations substantiating the nexus between expenditure and injury are not contained in the petition or in the affidavits; indeed, they are entirely absent. See discussion supra.
The assumptions and inferences Petitioner would have us draw are not supported by the record or any case. See Mottl, 95 Hawai'i at 395, 23 P.3d at 730. “Advertising” and “Marketing” are not defined in the Marketing RFP. “Absent an ambiguity, contract terms should be interpreted according to their plain, ordinary, and accepted sense in common speech.” Aickin v. Ocean View Invs. Co., 84 Hawai'i 447, 457, 935 P.2d 992, 1002 (1997) (quoting Cho Mark Oriental Food, Ltd. v. K & K Int’l, 73 Haw. 509, 520, 836 P.2d 1057, 1064 (1992)). “Resort to legal or other well accepted dictionaries is one way to determine the ordinary meaning of certain terms.” State v. Lian-Wen Chen, 77 Hawai'i 329, 337, 884 P.2d 392, 400 (App.) (internal quotation marks and citation omitted), cert. denied, 77 Hawai'i 489, 889 P.2d 66 (1994). As generally understood, “advertising” is “the action of calling something (as a commodity for sale, a service offered or desired) to the attention of [persons],” Webster’s Third Neto Int’l Dictionary 31 (1966), and “advertise” means “to describe or present (a product, organization, idea, etc.) in some medium of communication in order to induce [persons] to buy, support, or approve of it.” Id. at 20. “Marketing” is “the act or process of selling or purchasing in a market[;] ... the process or technique of promoting, selling, and distributing a product or servicef.]” Merriam Webster’s Collegiate Dictionary 712 (10th ed.1993). The seven project goals as set forth in the Marketing RFP are broad and general and lack a reference to any specific action. The process of advertising and marketing described is but merely one step in a long chain of events, which may or may not lead to the outcome sought. As a result, the effect of advertising and marketing expenditures, without more, may be indefinite and uncertain. To that extent, any injury claimed by Petitioner suffers from conjecture and speculation:
Such a protracted chain of causation fails both because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged acts to the asserted particularized injury. Most, if not all, of the individual links in the chain alleged by appellants depend on some allegation that cannot be easily described as true or false; as noted, we routinely refuse to permit such predictive assumptions to establish standing. See United Transportation Union [v. ICC], 891 F.2d [908,] 911-13 [ (D.C.Cir.1989), cert. denied, 497 U.S. 1024, 110 S.Ct. 3271, 111 L.Ed.2d 781 (1990)]. Also, most, if not all, of these links inescapably presume certain “independent actions of some third party not before this court.” Simon [v. Eastern Kentucky Welfare Rights Org.], 426 U.S. [26,] 42, 96 S.Ct. 1917, 48 L.Ed.2d 450 [ (1976) ].
Florida Audubon Soc’y v. Bentsen, 94 F.3d 658, 670 (D.C.Cir.1996) (holding that injury-in-fact test was not satisfied and plaintiffs did not have standing to bring action where no EIS was prepared upon Secretary of the Treasury’s extension of a tax credit for use of certain gasoline-ethanol blends to use of *254 blends of gasoline and a fuel additive derived from but not containing ethanol; injury was based on a “lengthy chain of conjecture”).
Because Petitioner must rely on a chain of conjecture, ultimately resting on the “independent actions of ... third parities],[1]” id., such as the actions of hypothetical tourists not before this court, there is no discernable link fairly traceable between the HTA’s expenditure and Petitioner’s injury within the scope of the injury-in-fact test.. Curbs on marketing expenditures such as those advocated by Petitioner more appropriately present political questions in which “value preferences” are asserted, rather than “issues [for] judicial (or quasi-judicial) proceedings.” Public Access Shoreline Hawaii v. Hawai'i County Planning Comm’n, 79 Hawai'i 425, 434 n. 15, 903 P.2d 1246, 1255 n. 15 (1995) (internal quotation marks and citation omitted), cert. denied, Nansay Haw. v. Public Access Shoreline Haw., 517 U.S. 1163, 116 S.Ct. 1559, 134 L.Ed.2d 660 (1996).
The assumption, such as it is, that there is a direct correlation between an expenditure and the number of tourists visiting Hawai'i, would, in this context, amount to conjecture and speculation. See Mottl, 95 Hawai'i at 394-95, 23 P.3d at 729-30 (plaintiff did not have standing because allegation that the withholding of six million dollars from the University of Hawaii’s appropriation resulted in a loss of support for working conditions, teaching programs, research programs, and other programs could not be directly traced to the alleged injury, as it “merely invites this court to infer that the plaintiffs, or at least some of them, were actually affected”); Kaapu v. Aloha Tower Dev. Corp., 74 Haw. 365, 392, 846 P.2d 882, 893 (1993) (plaintiff did not have standing to challenge redevelopment project where court established that “the record before [it was] devoid of both a causal connection between the alleged injury [of cultural significance] and [defendant's use of the [‘request for proposal’] procedure” as the mode of selection for a developer). See also Sierra Club v. Morton, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (petitioner did not have standing, even though the injury was traceable to the challenged action, where petitioner failed to allege that it or its members would be affected).
Consequently, Petitioner fails to establish the necessary causal connection between the HTA’s conduct and its claimed injury that was present in other cases in which this court has sustained a claim of standing. See Ka Pa‘akai O Ka'aina, 94 Hawai'i at 43, 7 P.3d at 1080 (petitioner had standing to challenge Land Use Commission’s action because such action would be responsible for “endanger[ing] its members’ gathering activities and negatively impacting] their access rights”); Citizens for the Protection of the N. Kohala Coastline v. County of Hawai'i, 91 Hawai'i 94, 101, 979 P.2d 1120, 1127 (1999) (petitioner had standing to challenge development project because its members’ “use [of] the shoreline area within dozens of feet of [the] ... proposed structures ... is potentially harmed by the project” (internal quotation marks omitted)); Richard v. Metcalf, 82 Hawai'i 249, 255, 921 P.2d 169, 175 (1996) (plaintiff established standing where accidental “injury [wa]s fairly traceable to the [Department of Commerce and Consumer Affairs]’ adoption of [a statute]”); Bush v. Watson, 81 Hawai'i 474, 479, 918 P.2d 1130, 1135 (appellants adequately established grounds for standing where injury resulting from Hawaiian Homes Commission’s violation of trust duties by failing to represent interests of Hawailans wanting to become economically self-sufficient was “traceable to the HHC’s approval of [certain third party agreements]”), reconsideration denied, 82 Hawai'i 156, 920 P.2d 370 (1996), cert. denied, Albino v. Machado, 519 U.S. 1149, 117 S.Ct. 1082, 137 L.Ed.2d 217 (1997); Pele Defense Fund v. Paty, 73 Haw. 578, 594, 837 P.2d 1247, 1258 (1992) (petitioner had standing to challenge exchange of publicly ceded lands because “[petitioner’s economic and/or aesthetic] injuries [that resulted from a transfer of trust lands in contravention of trust terms] are traceable to the alleged breach of trust”), cert. denied, 507 U.S. 918, 113 S.Ct. 1277, 122 L.Ed.2d 671 (1993).
VI.
In attempting to draw a connection between expenditures under the market *255 ing contract and an increase in the number of visitors, Petitioner alleged: (1) that “[a] study prepared by Longwoods International” concluded that “an emergency advertising campaign” in 1997 in which the State of Hawai'i spent ten million dollars, “brought” more than 800,000 visitors to Hawai'i from the mainland and Japan; (2) that four million dollars spent in the United States “influenced an estimated 496,000 additional visits from the mainland in 1998 and 1999”; (3) that a “$6 million expenditure in Japan influenced an additional 314,000 trips over the two-year period following the campaign from Japan”; and (4) that “[i]t is probable that the expenditure of $114 million in State funds over three years in the United States and in Japan, and other international locales, will result in like increases in the number of tourists visiting the major islands constituting the State of Hawai'i.” [17] (Emphases added.) For this allegation, the petition apparently relies on a September 15, 1999 press release by HVCB discussing the Longwoods Study. The press release, which is referred to in a footnote[18] to Petitioner’s memorandum in support of its motion for summary judgment, is attached as an exhibit to the motion. The exhibit, of course, constitutes hearsay.[19]
Hearsay aside, the petition does not evince any factual connections between the 1997 campaign discussed in the Longwoods Study and the marketing project in this case, except that they both involve expenditures of money. The petition does not indicate the purpose of the Longwoods Study, the data underlying its conclusions, how expenditures “brought” visitors or “influenced” their trips to Hawai'i, or the manner in which any of the above was determined. The apparent objective of the 1997 advertising campaign was to increase visitor arrivals.
However, as described, the express objective of the marketing contract is to increase expenditures by visitors. Nothing in the petition or the press release indicates that the “emergency” advertising campaign was similar to the marketing program mandated under the Marketing RFP. There is no mention that the marketing methodology used in the “emergency” campaign is the same as that employed under the marketing contract. Petitioner’s submissions do not substantiate that the circumstances surrounding the period covered by the study were the same or similar to the period covered by the marketing contract. Consequently, in the absence of a demonstrated similarity between the 1997 campaign and the marketing contract, the Longwoods Study cannot support Petitioner’s contention that the present marketing project would result in an increase in the number of visitors.[20]
*256 VIL
We have concluded that Petitioner’s allegations in its petition and summary judgment affidavits fail to allege or create a genuine issue of material fact as to whether there is an actual or threatened injury resulting from the HTA’s conduct or that the injury is fairly traceable to the HTA’s challenged action. Further, we do not believe that “the injury is likely to be remedied by” this court’s grant of injunctive or declaratory relief. Mottl, 95 Hawai'i at 391, 23 P.3d at 726 (citation omitted).
As stated, the goal of the marketing contract is an increase of expenditures by tourists. Assuming that tourists have expended or would expend more because of the project, there is nothing in the record indicating that an increase in tourist expenditures resulted in or would result in increased use or burdens on the interests identified by Petitioner. Assuming, further, that the project resulted in a growth in the number of visitors, nothing suggests that an abandonment of the marketing project would obviate the impact on Petitioner’s particular interests. Obviously, marketing campaigns by other entities, including hotel, transportation, and tour companies, would not be curtailed by granting Petitioner the relief requested. Moreover, as indicated supra, Petitioner’s members’ affidavits fail to account for the effect of other factors or of non-tourists on them interests; that effect would not be precluded by the judicial relief requested.
In contrast to the instant case, standing has been granted where the court’s intervention would result in preventing the injuries suffered. See Richard, 82 Hawai'i at 251, 255, 921 P.2d at 171, 175 (in a case where a plaintiff brought a suit against the State Insurance Commissioner and the Department of Commerce and Consumer Affairs for declaratory judgment that a no-fault insurer was not subject to peer review procedures to resolve treatment requests for injuries which occurred prior to the effective date of amendments to fee schedule and peer review statutes, the plaintiff had standing because, inter alia, “a decision precluding use of peer review procedures with respect to treatment requests for motor vehicle accidents that occurred prior to January 1, 1993 would likely provide relief for [the plaintiffTs alleged injury”); Bush, 81 Hawai'i at 476-79, 918 P.2d at 1132-35 (in a case where Native Hawaiian homestead lessees challenged certain third party agreements (TPAs) between other lessees and non-Hawaiian farmers as violating the Hawaiian Homes Commission Act, requested declaratory and injunctive relief, and alleged that the Hawaiian Homes Commission’s approval of the TP As injured them by unduly burdening them commercial farming interests, the plaintiffs established standing, inter alia, because “invalidation of the TP As would allow the [plaintiffs] to pursue commercially viable farming efforts”); Pele Defense Fund, 73 Haw. at 594, 837 P.2d at 1258 (in a case where a nonprofit corporation challenged a state’s decision to exchange public ceded lands, alleging, inter alia, a breach of trust under section 5(f) of the Admission Act, the plaintiff established its standing because, inter alia, “the requested relief[, ie., an injunction remedying the State’s breach of its trust obligations,] would be likely to remedy the injuries by giving beneficial use of the exchanged land to trust beneficiaries”).
In sum, we cannot say in this case that the purported injury is likely to be remedied by a favorable decision.[21] See Kaapu, 74 Haw. at 392-93, 846 P.2d at 893-94 (in a case where a plaintiff challenged the state agency’s selection method for a developer with which it would negotiate the terms of a long-term development of the Aloha Tower complex (ie., the RFP), the plaintiff did not have standing because, inter alia, “there has been no showing that [the alternative selection procedures] would have protected [the plaintiff]’s interests ... to a greater extent than the RFP system actually utilized”). Thus, we hold that Petitioner has failed to establish the third prong of the “injury-in-fact” test, ie., that its “injury is likely to be remedied by a favorable decision.” Mottl, 95 Hawai'i *257 at 391, 23 P.3d at 726 (internal quotation marks and citation omitted).
VIII.
Separate from its allegations regarding adverse impacts on the environment, Petitioner makes three other claims.
IX.
In its summary judgment motion, Petitioner maintains that it has suffered an “informational injury in fact.” There is no Hawaii case law on “informational injury.” In Foundation on Economic Trends v. Lyng, 943 F.2d 79 (D.C.Cir.1991), the United States Court of Appeals for the District of Columbia Circuit held that “an organization’s standing in a NEPA case” cannot be sustained “solely on the basis of ‘informational injury,’ that is, damage to the organization’s interest in disseminating the environmental data an impact statement could be expected to contain.” Id. at 84. The court acknowledged that, while there was “the logical appeal” of extending standing on such a basis, id., such an approach “would potentially eliminate any standing requirement in NEPA cases, save when an organization was foolish enough to allege that it wanted the information for reasons having nothing to do with the environment.” Id.
Moreover, the court observed that “[t]he proposition that an organization’s desire to supply environmental information to its members, and the consequent ‘injury’ it suffers when the information is not forthcoming in an impact statement, establishes standing without more also encounters the obstacle of Morton, [supra].” Id. at 84-85. “The Supreme Court there held ... that a mere interest in a problem, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient to confer standing.” Id. at 85 (internal quotation marks and citation omitted). We agree with Lyng’s reasoning. An “informational injury” does not establish an injury required for standing.
X.
Petitioner also contends that it has sustained an injury from the “increased likelihood” of an erroneous decision, because “agency decision-makers are not adequately informed as to the nature and extent of environmental impacts, real environmental harm will occur through inadequate foresight and deliberation.” (Quoting Sierra Club v. Marsh, 872 F.2d 497, 504 (1st Cir.1989)). We construe this argument as one of “procedural standing,” alluded to by the U.S. Supreme Court in dicta in Lujan v. Defenders of Wildlife, 504 U.S. 555, 572 n. 7, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). For the reasons stated in Part XII, infra, we do not agree with this argument.
XI.
Finally, Petitioner asserts that a “plaintiffs belief that it can establish standing with its success on the merits” is not persuasive because standing must be established at the beginning of the case. Atlantic States Legal Found. v. Babbitt, 140 F.Supp.2d 185, 194 (N.D.N.Y.2001). The district court pointed out that
[t]he doctrine of standing is intended to ensure that a plaintiff has an interest in the litigation at the outset of suit. For this reason, standing must be established in the beginning rather than end of litigation. See Cook v. Colgate Univ., 992 F.2d [17,] 19 [ (2d Cir1993) ]. If the court were to adopt plaintiffs position, it would effectively ignore this fundamental maxim of long established jurisprudence.
Id. We also agree' with Babbitt. Because “standing must be established in the beginning” of a case, id., Petitioner’s allegations of “informational injury” and “injury resulting from increased likelihood of an emmeous decision” must satisfy the injury in fact test. The so called “informational injury” and “injury from increased likelihood of an erroneous decision” are not “distinct and palpable” but, under the circumstances, are conjectural and “hypothetical” injuries. Mottl, 95 Hawai'i at 389, 23 P.3d at 724 (internal quotation marks and citation omitted). We hold then that Petitioner’s allegations have failed *258 to establish an “injury” under the injury-in-fact test.
XII.
We observe that reference to “procedural standing” within the parties’ pleadings is scant, at best, and that, as such, this issue has not been adequately briefed by either party. Petitioner’s entire argument on this subject is four sentences long,[22] and, although Respondent’s response addresses standing generally, it does not discuss “procedural injury” at all. However, since this issue has been seized upon by the concurrence and dissent, we address it here.
We note further that, with all due respect, it is incongruous for the dissent to conclude that Sierra Club has standing but at the same time maintain that it need not say what its position would be as to the merits of the present case. Such an indication would not be “futile,” because if in fact the dissent would hold against the Petitioners on the merits, its true position should be a concurrence with the result herein, in the form of a decision concurring in part and dissenting in part. For example, even if the dissent determines that there is standing, that would not necessarily alter the result in this ease inasmuch as the dissent’s position might, for example, conform with one of the positions taken by the HTA, i.e., that the HTA is not an agency, and therefore is not under an obligation to produce an EA.[23] We would not find that argument meritorious.
A.
Procedural standing is a construct based on federal statutes and has been applied in federal lawsuits when a plaintiff seeks review of an administrative decision pursuant to “citizen-suit” provisions.[24] In environmental suits, in which this construct has principally been applied, plaintiffs may sue for NEPA violations under the federal Administrative Procedures Act (APA), 5 USOS § 702 (2001), see, e.g., Bennett v. Spear, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), because NEPA does not have its own provision providing for judicial review, and independently under the Endangered Species Act (ESA), 16 U.S.C. § 1536(n) (2001), see, e.g., Florida Key Deer v. Stickney, 864 F.Supp. 1222 (S.D.Fla.1994), which contains its own citizen-suit provision. Procedural injury standing modifies the traditional constitutional requirements for as *259 serting an injury under some conditions. Under federal decisions, once a plaintiff establishes a procedural injury, the plaintiff may not be required to meet normal thresholds of some of the other elements of standing. See Lujan, 504 U.S. at 572 n. 7, 112 S.Ct. 2130 (“The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redress-ability and immediacy.”).
Qualification for procedural standing in federal court is said to require satisfaction of a two-part test.[25] “To establish procedural standing, the plaintiff must show: (1) that it has been accorded a procedural right to protect its concrete interests, and (2) that it has a threatened concrete interest that is the ultimate basis of its standing.” Churchill County v. Babbitt, 150 F.3d 1072, 1078 (9th Cir.1998) (citations omitted). In connection with the first requirement, the procedural right to protect concrete interests must be granted pursuant to the challenged statute. See Douglas County v. Babbitt, 48 F.3d 1495 (9th Cir.1995) (“[S]ome of our eases and some language in Lujan require that plaintiffs have a right conferred by the challenged statute[;] we require that showing in this case.”).
For the second step, the plaintiff must show “a threatened concrete interest that is the ultimate basis of its standing[,]” Churchill County, 150 F.3d at 1078 (citations omitted). In addition, when a plaintiff proceeds under the APA, the plaintiff must show, as a prudential standing matter, that the threatened “concrete interests” to be protected fall within the “zone of interests” the challenged statute was designed to protect [26] Because citizen suit provisions are *260 intended to establish the first requirement, a “procedural right,” see supra note 24, most federal courts addressing the issue concentrate solely on the second step, see, e.g., Friends of the Earth v. United States Navy, 841 F.2d 927, 931-32 (9th Cir.1988). However, both steps are crucial in order for a plaintiff to qualify for “procedural standing.” See Lujan, 504 U.S. at 572 n. 7, 112 S.Ct. 2130; Douglas County v. Babbitt, supra,.
It is evident that the federal construct of a procedural right is not germane in this case because (1) HRS § 343-7, the Hawaii statute at issue, establishes who and under what circumstances the lack of an EA, may be challenged, and (2) federal cases recognizing this standard are inapposite, as they rest on non-analogous statutes. Thus, Petitioner cannot be afforded so-called “procedural standing” under HRS § 343-7(a).[27]
B.
The basis for asserting procedural rights, as noted supra, was briefly mentioned by the United States Supreme Court in a footnote in Lujan, 504 U.S. at 572 n. 7, 112 S.Ct. 2130.[28] In Lujan, the U.S. Supreme Court considered whether Defenders, consisting of several environmental groups, had standing to challenge a regulation promulgated by the Secretary of the Interior interpreting § 7 of the ESA. See id. at 557-58, 112 S.Ct. 2130.
Section 7 of the ESA required federal agencies to insure that their actions would not harm or threaten endangered species. See id. at 558, 112 S.Ct. 2130. Initially, a regulation had interpreted § 7 as extending to actions taken in foreign nations. See id. at 558, 112 S.Ct. 2130. A revised regulation, at issue in Lujan, was promulgated that reinterpreted § 7 as pertaining only to actions taken within the United States or on the high seas. See id. at 558-59, 112 S.Ct. 2130.
Defenders filed suit against the Secretary of the Interior in federal District Court, seeking a declaratory judgment that the revision was in error and an injunction requiring the Secretary to promulgate a new rule consistent with the former interpretation. See id. at 559, 112 S.Ct. 2130. The Secretary filed a motion to dismiss for lack of standing, which the district court granted. Id. (citing Defenders of Wildlife v. Hodel, 658 F.Supp. 43, 47-48 (D.Minn.1987)). The Eighth Circuit, by a divided vote, reversed and remanded.[29] Id. (citing Defenders of Wildlife v. Hodel, 851 F.2d 1035 (8th Cir.1988)).
*261 After remand, the ease again came up on appeal. On certiorari, the Court addressed, inter alia, the Eighth Circuit’s determination that Defenders had standing on the basis of a procedural injury. See id. at 571-72, 112 S.Ct. 2130. The Eighth Circuit had relied upon the citizen suit provision of the ESA, which states that “any person may commence a civil suit on his own behalf (A) to enjoin any person, including the United States and any other governmental instrumentality or agency ... who is alleged to be in violation of any provision of this chapter.” Id. at 572, 112 S.Ct. 2130 (citations omitted.) The Court rejected the proposition that the broadly worded citizen-suit provision, which, in itself, conferred a procedural right upon every citizen, translated into standing, without a concrete interest that was threatened. Id. 572, 112 S.Ct. 2130 (citation omitted). In passing, the Court indicated in a footnote that a “person who has been accorded a procedural light to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.” Id. at 572 n. 7, 112 S.Ct. 2130; see supra note 28. Because the Court determined that Defenders had not alleged sufficient immediacy of harm, the Court did not elaborate on the suggestion of a “procedural injury” doctrine in its footnote.
Subsequent to Lujan, this dicta became the basis for procedural injury standing. Coined “footnote seven standing,” see Pacific Northwest Generating Co-op. v. Brown, 38 F.3d 1058, 1065 (9th Cir.1994); Brian J. Gatehel, Informational and Procedural Staviding after Lujan v. Defenders of Wildlife, 11 J. Land Use & Envtl. L. 75, 91 (1995), federal courts since Lujan, have analyzed procedural standing as pertaining to the Ar-tide III “case or controversy” requirement, see, e.g., Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, (4th Cir.2000).
C.
The federal procedural standing standard relaxes the constitutional requirements somewhat, but only when a potential plaintiff has shown that “(1) it has been accorded a procedural right to protect its concrete interests, and (2) that it has a threatened concrete interest that is the ultimate basis of its standing.” Churchill County, 150 F.3d at 1078 (citations omitted). In contrast to the non-specific citizen suit provisions involved in federal decisions which allow “any person” a right to sue, and upon which the concurrence and dissent rely, the provision allowing judicial review in chapter 343 specifically relates to a procedural challenge to the lack of an EA. See Akau v. Olohana Coyp., 65 Haw. 383, 390, 652 P.2d 1130, 1135 (1982) (“[T]he legislature may limit standing to sue despite an injury in fact where plaintiff asserts rights that arise from a statute!.] Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)[.]”); Sierra Club v. Morton, 405 U.S. 727, 732, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (“Where, however, Congress has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff.”). In HRS § 343-7, which pertains to actions relating to “the lack of [ah environmental] assessment required under section 343-5,” the *262 legislature permitted “judicial action” by “aggrieved parties!,]” as described therein. HRS § 343-7(a) provides:
Any judicial proceeding, the subject of which is the lack of assessment required under section SiS-5, shall be initiated within one hundred twenty days of the agency’s decision to cany out or approve the action, or, if a proposed action is undertaken without a formal determination by the agency that a statement is or is not required, a judicial proceeding shall be instituted within one hundred twenty days after the proposed action is started. The council or office, any agency responsible for approval of the action, or the applicant shall be adjudged an aggrieved party for the purposes of bringing judicial action under this subsection. Others, by court action, may be adjudged aggrieved.
Id. (emphases added). Hence, specifically named parties have an automatic right of action regarding the lack of an assessment required under HRS § 343—5:(l)[t]he council or office,[30] any agency responsible for approval of the action, or (2) the applicant. But any other party seeking to challenge “the lack of an assessment ... under section 343 5” must satisfy the criterion that they are “[o]thers, [who] by court action, may be adjudged aggrieved.” Id.
D.
This enumeration of who may assert a right of action may be viewed as the legislature’s designation of those parties having a “procedural right” to have an EA statement prepared. As the parties listed in HRS § 343-7(a) are the only ones who can enforce the lack of an EA statement, they are the only ones who may arguably assert a “procedural injury” via court action. See Benally v. Hodel, 940 F.2d 1194, 1199 (9th Cm. 1991) (“The [Navajo and Hopi] Settlement Act establishes that it is the tribal chairman who can vindicate individual rights in an intertri-bal dispute!.] • • • It is this broad right of action which we read as implying a procedural right in tribal chairman to challenge government compliance with the dictates of the Settlement Act.”); Lindahl v. Office of Personnel Management, 718 F.2d 391, 395 (Fed.Cir.1983) (“An express statutory provision that certain decisions of an administrative agency ‘are final and conclusive and are not subject to review’ should not be interpreted as though it said such decisions ‘are not final and are not conclusive and are subject to some judicial review.”).
The distinction drawn in HRS § 343-7(a) is between those named parties who could be said to have an unquestioned right of action and “others,” who must show that they are aggrieved in some way, in a court action. In mandatory terms, HRS § 343-7(a) directs that the council or office, any agency responsible for approval of the action, or the applicant “shall be adjudged an aggrieved party for the purposes of bringing judicial action under this subsection.” (Emphasis added.) In contrast, “others,” i.e., those not named supra, “may be adjudged aggrieved” only “by court action].]” (Emphasis added.)
Thus, “others” must show in a court action brought under § 343-7(a) that they are aggrieved and must be adjudged aggrieved, in concert with a challenge to the lack of an EA statement. To be adjudged aggrieved, under our case law, it follows that such parties must satisfy the injury-in-fact test requirements. See, e.g., Public Access Shoreline Hawaii v. Hawai‘i County Planning Comm’n, 79 Hawai'i 425, 431, 903 P.2d 1246, 1252 (1995) (requiring that “the claimant’s legal interests *263 must have been injured—i.e., the claimant must have standing to appeal,” as demonstrated by the injury-in-fact test, as one of the requirements for appellate jurisdiction under HAP A).
E.
As set forth supra, in Parts IV-XI, Petitioner has not established in this action the necessary standing, i.e., aggrievement requirements. In the absence of an adjudication to the effect that it has, Petitioner cannot be deemed statutorily-authorized to “bring[ ] judicial action under [HRS § 343-7(a) ]” to have the EA statement prepared. It is only in concert with having been adjudged aggrieved that “others,” such as Petitioner, have rights under HRS § 343-7(a).
Thus, HRS § 343-7(a) allows judicial review, but does not contain language affording Petitioner an automatic right to review. Petitioner did not, under the terms of the statute, establish a so-called “procedural right” platform from which it could assert a “procedural injury,” in the absence of an actual or threatened injury in fact. See Friends of the Earth, 204 F.3d at 155 (“In addition to meeting the ‘irreducible’ constitutional minimum, an individual must also satisfy any statutory requirements for standing before bringing suit”),
XIII.
A.
Further, Petitioner’s reliance on federal cases construing federal statutes is misplaced, inasmuch as HRS § 343-7(a) is substantively different.[31] We observe that the federal statutes conferring a procedural right in these cases are far less specific than HRS § 343-7. The language of HRS § 343-7(a) expressing legislative intent to specifically describe the class of litigants who might challenge the lack of an EA is in plain contrast to the general language employed in NEPA and the APA.[32] The contrast is illuminated by comparison to the two provisions cited by federal cases allowing procedural standing.
In the Endangered Species Act (ESA), the statute pertinent in Lujan, Congress, in a citizen-suit provision, instructed that “any person may commence a civil suit on his own behalf (A) to enjoin any person, including the United States and any other governmental instrumentality or agency ... who is alleged to be in violation of any provision of this chapter.”[33] 16 U.S.C. § 1540(g) (quoted in *264 Lujan, 504 U.S. at 571-72, 112 S.Ct. 2130) (emphasis added). Additionally, NEPA, which Petitioner contends is the federal “counterpart” of HEPA[,] although “wider in scope than the federal or typical state analogue[,]” is also inapposite to HRS § 343-7(a). NEPA lacks any specific private action language at all; and thus, as previously mentioned, the federal courts rely upon the citizen suit provisions of the APA to provide a right of action.
In relevant part, the APA states that “[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.” 5 U.S.C. 702 (emphasis added). Cases cited by Petitioner, see Sierra Club v. Marsh, 872 F.2d 497 (1st Cir.1989) (addressing an alleged violation of NEPA during the preparation of an EIS, in which Sierra Club participated, without addressing Sierra Club’s standing to bring suit), and by the dissent, see Lujan, supra, (ESA); Douglas County, supra (invoking NEPA pursuant to the APA); Lujan v. National Wildlife Federation, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (invoking NEPA and the Federal Land Policy and Management Act (FLPMA) pursuant to the APA); Committee to Save the Rio Hondo v. Lucero, 102 F.3d 445 (10th Cm.1996) (invoking NEPA pursuant to the APA); Sierra Club v. Marita, 46 F.3d 606 (7th Cir.1995) (invoking NEPA and the National Forest Management Act (NFMA) pursuant to the APA); Florida Audubon Soc’y v. Bentsen, 94 F.3d 658 (D.C.Cir.1996) (invoking NEPA pursuant to the APA); Sierra Club v. Robertson, 28 F.3d 753 (8th Cir.1994) (same), are, thus, inappo-site.
B.
Our counterpart to the APA, the Hawai'i Administrative Procedures Act (HAPA), has not been alleged as a basis for a right of action by Petitioner. See supra note 26. Had it been, there would be no logical basis for employing it, inasmuch as, unlike NEPA HRS § 343-7(a) does contain exact language designating who may challenge the provisions relating to an EA. Aso, because HAPA applies only to judicial review of contested case hearings, see HRS § 91-14, or declaratory judgments by the circuit court on the validity of an agency rule,[34] see HRS § 91-7, or a declaratory order from an agency regarding “the applicability of any statutory provision or of any rule or order of the agency,” HRS § 91-8, resort to the HAPA would not be an appropriate vehicle in Petitioner’s situation.
Petitioner states that, “[t]here is no evidence that [the HTA] ever made any formal determination that an Environmental Assessment or an Environmental Impact Statement was or was not required prior to carrying out or approving the action on September 15, 1999.” Thus, there is no contested case hearing held that Petitioner may dispute, there has been no agency rule the validity of which Petitioner may question, nor does Petitioner seek a declaratory order from the HTA. Hence, HAPA is wholly inapplicable to Petitioner’s case and requests for relief.
In sum, the federal statutes and case law do not provide an analogue to HRS § 343-7(a).
XIV.
Additionally, aside from the plain language of the statute, concluding that federal procedural standing requirements apply in the present ease, rather than the traditional “injury in fact” test, would ignore the relevant legislative context in which HRS § 343-7 was enacted. Because our case law at the time this provision was passed did not use a “procedural standing” test, the legislature could not have intended this lower threshold to be utilized. In any event, the base line is the express grant to bring suit that is set by the legislature in HRS § 3j3-7. We cannot ex- *265 pcmd standing beyond what the legislature intended, because that is one of the requirements that a potential plaintiff must meet.
XV.
Having held that Petitioner lacks standing in this case to bring its suit,[35] we dismiss Petitioner’s January 11, 2000 petition.

. HRS § 201B-6 provides in pertinent part as follows:
Tourism marketing plan; measures of effectiveness.
(a) The authority shall be responsible for developing a strategic tourism marketing plan that shall be updated every three years and includes the following:
(1) Identification and evaluation of current and future tourism needs for the different regions of the State;
(2) Goals and objectives in accordance with identified needs;
(3) Statewide promotional efforts and programs;
(4) Targeted markets;
(5) Efforts to enter into brand marketing projects that make effective use of cooperative advertising programs;
(6) Measures of effectiveness for the authority’s promotional programs; and
(7) Coordination of marketing plans of all destination marketing organizations receiving state funding prior to finalization of the authority’s marketing plan.

. According to the draft TSP, the phrase “ke kumu’’ is a Hawaiian term and means (1) “[bjase, foundation, basis, title (as to land), main stalk of a tree,” (2) "[tjeacher, tutor, manual, primer, model, pattern,” (3) "[bjeginning, source, origin," and (4) "[rjeason, cause, goal, purpose.” See also M. Pukui & S. Elbert, Hawai'ian Dictionary 140, 182 (rev. ed.1986) (defining the word “ke” as "definite article, ... often *246 translated 'the' ” and the word "kumu” as "[blot-tom, base, foundation, basis, title (as to land), main stalk of a tree, trunk, handle, root (in arithmetic), basis, hereditary, fundamental,” (2) "[tjeacher, tutor, manual, primer, model, pattern,” (3) "[b]eginning, source, origin, starting point of plaiting” and (4) "[rjeason, cause, goal, justification, motive grounds, purpose, object, why").

. The major market areas were identified as U.S. West (Alaska, Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, Wyoming); U.S. East (all other states); Japan; Canada; Europe (France, Germany, Italy, Switzerland, and the U.K.); Latin America (Argentina, Brazil, and Mexico); other Asia (China, Hong Kong, Korea, Singapore, and Taiwan); Oceania (Australia and New Zealand); Hawai'i Convention Center; Other (all other geographical areas).

. The Marketing RFP excluded proposals for management of marketing services for the Meetings, Convention and Incentives (MCI) markets as well as the marketing services of the Hawai'i Convention Center. As to the "management of marketing services for the [MCI] markets," the HTA issued a request for “Proposal for Marketing Services for the [MCI] Markets” (MCI RFP) on August 20, 1999.
In a memorandum in support of the HTA’s motion for summary judgment, the HTA staled
that “[i]t is unclear as to whether Petitioner is challenging the Respondents' expenditure of state funds for only the Marketing RFP or also for the MCI RFP.” However, the petition states that Petitioner challenges the HTA's action "in approving the expenditure of $114 million of state funds ... for advertising and marketing services ... without first preparing an [EA.]” The contract term for the MCI RFP was "a minimum of 3 years with an option to renew” and the project budget was "approximately $6 million” annually.
In its memorandum in opposition to the HTA's motion for summary judgment, Petitioner stated that the MCI RFP "[is] not the express subject[] of this lawsuit, although [it] certainly could be." Thus, while not specifically indicated, it is clear that Petitioner challenges the Marketing RFP, and, therefore, we do not consider the MCI RFP in this case.

. As to the 4.6% annual growth in visitor expenditures, the Draft TSP states as follows:
The HTA[] seeks to manage the growth of tourism's contribution to Hawaii's economy by targeting an average annual uninflated growth of 4.6 percent in visitor expenditures through 2005. Visitor expenditures are a product of three variables: 1) visitor expenditures per person per day; 2) length of stay; and 3) the number of visitor arrivals. The HTA’s focus will be on better utilization of existing *247 facilities, value-added visitor products and experiences, and increasing yield.... The HTA seeks to manage the growth of tourism's contribution to Hawaii’s economy by targeting an average annual uninflated growth of 4.6 percent in visitor expenditures through 2005 (2.7 percent real growth after adjusting for inflation). This moderate rate of growth is lower than the growth experienced historically and would boost Hawaii's overall economy by approximately 0.7 percent. Modest growth in Hawaii's visitor industry will provide additional resources, and help leverage economic diversification initiatives of the state.
(Emphases added.)

. HRS § 201B—12(b) provides, with respect to exemption of the HTA from taxation and the Hawaii public procurement code that
[t]he [HTA] shall not be subject to chapter 103D and any and all other requirements of law for competitive bidding for project agreements, construction contracts, lease and sublease agreements, or other contracts unless a project agreement with respect to a project otherwise shall require.

. HRS § 20IB-15 provides for original jurisdiction of particular actions in this court as follows:
Any action or proceeding to which the [HTA], the State, or the county may be a party, in which any question arises as to the. validity of this chapter, shall be preferred over all other civil cases, except election cases, in any court of this State and shall be heard and determined in preference to all other civil cases pending therein except election cases, irrespective of position on the calendar. The same preference shall be granted upon application of counsel to the authority in any action or proceeding questioning the validity of this chapter in which the authority may be allowed to intervene. In addition to the preference provided in this section, any action or proceeding to which the authority, the State, or the county may be party, in which any question arises as to the validity of this chapter or any portion of this *248 chapter, or any action of the authority may be filed in the supreme court of the State, which court is hereby vested with original jurisdiction over the action. Notwithstanding any provision of law to the contrary, declaratory relief from the supreme court may be obtained for any action.
(Emphases added.)

. HRS § 201B-15 was amended in the 2001 legislative session, after this case was heard in oral argument, removing original jurisdiction in the Supreme Court and vesting it in the circuit court of the circuit where the case or controversy arose. See 2001 Haw. Sess. L. Act 251, § 1 at 648.

. HRS § 343—5(a)(l) provides as follows:
Applicability and requirements, (a) Except as otherwise provided, an environmental assessment shall be required for actions which:
(1) Propose the use of state or county lands or the use of state or county funds, other than funds to be used for feasibility or planning studies for possible future programs or projects which the agency has not approved, adopted, or funded, or funds to be used for the acquisition of unimproved real property; provided that the agency shall consider environmental factors and available alternatives in its feasibility or planning studies!.]
(Boldfaced font in original) (emphasis added.) The term " '[ajetion’ means any program or project to be initiated by any agency or applicant.” HRS § 343-2 (Supp.2000). While we do not consider the merits of the parlies' arguments in this case, we note that the language of HRS § 343-5(a)(l), literally read, appears to require that an environmental assessment be made for any use of state or county funds, unless the statute is clarified by the legislature.
The concurrence’s limiting of the applicability of HRS § 343-5(a)(l) to land related matters is too narrow. That section expressly requires an environmental assessment for actions which ”[p]ropose the use of state or county lands or the use of state or county funds." Id. (emphasis added). This language clearly indicates that HRS § 343-5(a)(l) applies to more than just land related matters.

. The HTA’s motion for summary judgment maintained: (1) that HRS chapter 343 triggers environmental reviews only for "projects” and "programs” involving site-specific developments and that to interpret "program” more broadly would lead to an absurd result because EAs would then be required for everything; (2) that the State Environmental Council and Office of Environmental Quality Control have applied chapter 343 to only site-specific developments; (3) that amendments to chapter 343 reflect a legislative intent that an environmental review be limited to site-specific developments; (4) that the expenditure of state funds to promote tourism is not an agency action but, rather, a legislative action; (5) that the marketing campaign’s goal is to increase visitor expenditures, rather than the number of visitors; (6) that an environmental review of the tourism marketing campaign would have no useful decision-making function and would not pass the test of reasonableness; and (7) that the court lacks jurisdiction to resolve a political question as to whether the "triggering” action should be extended to include all expenditures of state or county funds.

.The HTA also argued the following: (1) that Petitioner is not entitled to injunctive relief because HRS § 201B-15 was never intended to be used for injunctive relief; (2) that the circumstances in this case do not justify injunctive relief; (3) that an environmental review under chapter 343 is not triggered by its tourism marketing plan or marketing contracts; (4) that the HTA complied with all applicable laws prior to soliciting a contractor to implement its tourism strategic plan; (5) that Petitioner’s action is barred by the running of the statute of limitations in HRS chapter 343; (6) that laches bars Petitioner from receiving injunctive relief; (7) that Petitioner’s assumptions on the increased number of visitors caused by the tourism marketing plan are not based on undisputed facts; and (8) that tite National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 et seq., cannot provide guidance for interpreting "programs” under chapter 343. In addition, in its answer to the petition, the HTA alternatively denied it was an agency.

. In the quote, the term "wrongful” before the word "conduct” is deleted. In some circumstances, the wrongfulness of the conduct may be apparent. The nature of the conduct involved, however, ultimately rests on the determination of standing, and therefore in the formulation of the injury-in-fact test the initial characterization of tire conduct as "wrongful” is unnecessary and may be misleading.

. The concurrence would require a prospective plaintiff to prove "a 'geographic nexus’ to [] lands [designated by HRS § 343-5(a)] in order to establish a concrete interest.” See concurring opinion at 268, 59 P.3d at 903. However, this requirement is essentially encompassed in the injury-in-fact test—the first two prongs of which require that (1) "the plaintiff [has] suffered an actual or threatened injury as a result of the defendant's ... conduct” and (2) “the injury [be] fairly traceable to the defendant’s actions[.j” See discussion and cases cited at Part III, supra.

. The dissent misstates this proposition, asserting that it is “insist[ed] that Sierra Club demonstrate that the environment has been or will be harmed[,]” rather than that "Sierra Club’s plaintiff members—not the environment—have been or will be harmed.” Dissenting opinion at 1 (emphases in original). In fact, Petitioner’s claim rest on the fact that perceived harm to the environment will affect their interests in and use of die land, air, and water probably affected. Thus, it is their specific claim of harm to the environment that is evaluated.

. The concurrence’s contention that, under this opinion, Sierra Club "would have to wait until its concrete interests were injured by the completion or near completion of the marketing plant,J" is mistaken. Concurring opinion at 268, 59 P.3d at 903. The cases we have cited hold to the contrary. See discussion and cited cases in Part III, supra. For instance, as to the first prong of establishing the injury-in-fact test, the plaintiff need only show it "has ... suffered an actual or threatened injury as a result of the defendant’s ... conduct!.]” Mottl, 95 Hawai'i at 389, 23 P.3d at 724 (internal quotation marks and citations omitted) (emphasis added). Hence, we do not hold that Sierra Club was required to "wait until its concrete interests were injured by the completion or near completion of the marketing planLJ[1]’ but that they show the threat thereof met the three-part test.

. The HTA stated that it did not have "knowledge or information sufficient to form a belief as to the truth or falsity” of the first three statements and denied the fourth allegation.

. The footnote states that "Longwoods International prepared an independent study for HVCB establishing that $10 million spent on emergency advertising in 1997 brought to Hawai'i an additional 890,000 visitors in 1998 and 1999.”

. “[A] motion for summary judgment may be decided only on the basis of admissible evidence.” Takaki v. Allied Machinery Corp., 87 Hawai'i 57, 69, 951 P.2d 507, 519 (App.1998) (citing Munoz v. Yuen, 66 Haw. 603, 605, 670 P.2d 825, 826 (1983) (per curiam)); see also Blair v. Ing, 95 Hawai'i 247, 270 n. 19, 21 P.3d 452, 475 n. 19 (2001) ("Inadmissible evidence cannot create a genuine issue of material fact.”); Keka, 94 Hawai'i at 222-23, 11 P.3d at 10-11 (2000) (holding that "the circuit court erred in relying upon [inadmissible evidence] in granting summary judgment in [plaintiffl’s favor"). While the press release itself was authenticated by a member of Petitioner, see Nakato v. Macharg, 89 Hawai'i 79, 88, 969 P.2d 824, 833 (App.1998) (holding that, to be admissible, documents submitted in support of a summary judgment motion must be authenticated by and attached to an affidavit that meets the requirements of applicable rule of procedure, and the affiant must be a person through whom the exhibits could be admitted into evidence), the references to the Long-woods Study in the press release are inadmissible hearsay. See Hawai'i Rules of Evidence (HRE) Rule 801(3) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.”); HRE Rule 802 ("Hearsay is not admissible except as provided by these rules, or by other rules prescribed by the Hawai'i supreme court, or by statute.”).

.The Longwoods Study, as far as related by Petitioner, did not suggest what, if any, adverse impact on the environmental interests identified by Petitioner occurred as a result of the increased arrivals.

. We note that according to the Marketing RFP, the marketing contract is subject to termination because of "non performance,” a "change in the administration," “funding," or "the convenience of the state." Expenditures under the contract, then, are subject to further contingencies—in this instance, legal contingencies during its term.

.What we construe as Petitioner’s "procedural standing” argument is found within its Memorandum in Support of Motion for Summary Judgment. In entirety, it states as follows:
3. injury from Increased Likelihood of an Eironeous Decision
Finally, injury has occurred because without an EA the likelihood of environmental harm being caused by the project has been unreasonably increased. The federal First Circuit Court ruled that if, due to procedural violations of NEPA, agency decision-makers are not adequately informed as to the nature and extent of environmental impacts, "real environmental harm will occur through inadequate foresight and deliberation.” Sierra Club v. Marsh, 872 F.2d 497, 504 (1st Cir.1989).
Like NEPA, HEPA is largely a procedural statute which requires disclosure of environmental impacts prior to the undertaking of a project. HEPA "simply ensures agency consideration of environmental concerns before a decision is rendered.” (Emphasis added.) Pearl Ridge, supra.
Petitioner also states in a footnote to this section, "These arguments are without prejudice to the claim that the private environmental right of action in Article XI, § 9 of the State of Hawai'i has eliminated all standing requirements.”

. See supra note 12.

. "Citizen suit” provisions in federal environmental statutes are broadly worded provisions that, on their face, would allow anyone to challenge agency actions. As noted by one commentator, "[ejnvironmental statutes in the late 1960s and 1970s frequently included citizen suit provisions to recognize the interest of the public in protection of the environment, and permit 'private attorneys general’ to assist in implementation and enforcement.” Karin P. Sheldon, Steel Company v. Citizens for a Better Environment: Citizens Can’t Get No Psychic Satisfaction, 12 Tul. Envtl. L.J. 1, 38 (1998).
Prior to 1970, standing had rarely been an issue, and courts routinely relied upon Congressional determinations of who had standing to sue based upon statutes conferring judicial rpview, such as citizen suit provisions. Brian J. Gatchel, Informational and Procedural Standing after Lujan v. Defenders of Wildlife, 11 J. Land Use & Envtl. L. 75, 78 (1995). Thus, citizen suit provisions, such as those within the APA, set the threshold as to which plaintiffs could bring their suits to court, irrespective of whether there was any injury alleged. See id.

. The dissent mischaracterizes our forgoing statement as "[t]he plurality acknowledges that [the dissent] have correctly outlined the procedural injury framework used by federal courts to determine whether a plaintiff has stated a cognizable injury pursuant to NEPA.” Dissenting opinion at 278, 59 P.3d at 913. We are not "acknow-ledg[ing]” the dissent's outline of the procedural injury framework, but are simply setting forth the procedural standing requirements in federal court to give context to our discussion.

. The dissent applies the "zone of interests” test to Petitioner’s claim under HRS § 343-7(a) in error.
The APA provides a right to judicial review only when " 'there is no other adequate remedy at court,' 5 U.S.C. § 704, and applies universally 'except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law,' § 701(a).” Bennett v. Spear, 520 U.S. at 175, 117 S.Ct. 1154. Thus, the "zone of interests” test has been applied to challenges under the other statutes using the APA as a method of obtaining judicial review. See Clarke, Comptroller of the Currency v. Securities Industry Ass'n, 479 U.S. 388, 400 n. 16, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) ("The principal cases in which the 'zone of interest’ test has been applied are those involving claims under the APA, and the test is most usefully understood as a gloss on the meaning of § 702.”); Sierra Club v. Morton, 405 U.S. 727, 733, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Ass'n of Data Processing Serv. Orgs. Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Douglas County, supra; Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1354 (9th Cir.1994); Yesler Terrace Community Council v. Cisneros, 37 F.3d 442, 445 (9th Cir.1994).
The federal case law, then, indicates that the "zone of interests” test is applicable when (1) a plaintiff seeks to challenge an agency violation of an underlying statute using the APA, and (2) the APA is not available when the underlying statute provides an "adequate remedy at court.” However, the dissent argues the "zone of interests” test applies absent a claim under Hawai'i Administrative Procedures Act, HRS § chapter 91. Because the scope of review of the APA is so broad, the dissent’s use of this test when neither the APA nor HAPA are invoked is questionable at best.
Moreover, the dissent extends the scope of the zone of interests test to include "interests” within, not only the specific statutory provision at issue, but the entire scope of chapter 343, as well as an assortment of other constitutional and statutory provisions. Accordingly, the dissent does not adhere to the mandates of the test, itself. In Bennett v. Spear, supra, the U.S. Supreme Court instructed that the test is to be narrowly construed with reference to the underlying statute:
Whether a plaintiff s interest is "arguably ... protected ... by the statute" within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question (here, species preservation), but by reference to the particular provision of law upon which the plaintiff relies. ... In Data Processing itself, for example, we did not require that the plaintiffs’ suit vindicate the overall purpose of the Bank Service Corporation Act of 1962, but found it sufficient that their commercial interest was sought to be protected by the anti-competition limitation contained in §§ 4 of the Act—the specific provision which they alleged had been violated. As we said with the utmost clarity in National Wildlife Federation, "the *260 plaintiff must establish that the injury he complains of ... falls within the ‘zone of interests’ sought to be protected by the statutory provision whose violation forms the legal basis for his complaint.’’
Id. at 175-76, 90 S.Ct. 827 (internal citations omitted) (emphases added).
In the instant case, the provision Petitioner claims is the legal basis for its complaint is HRS § 343-5(b). The dissent, however, cites to the overall purposes of the EA requirement, see dissenting opinion at 276-77, 59 P.3d at 911-12 (citing HRS §§ 343-1, -2, -5(a), and -7(a)), and the Hawaii Constitution, see dissenting opinion at 276, 59 P.3d at 911 (citing Haw. Const. art. XI., § 9), and the legislative history of HRS § 343-7, see id. at 277-78, 59 P.3d at 912-13. Even assuming that the zone of interests test applies, which, as indicated supra, it does not, this shotgun approach using scattered provisions defeats the purpose of such a test.

.The concurrence makes an anomalous distinction between the so-called "procedure standing" and "substantive standing." As indicated infra, the so-called "procedural standing" is a limited federal doctrine implied from general language in federal statutes lacking the specificity set forth in HRS § 345-5. Thus, case law stemming from such a doctrine is not relevant to our own detailed statute.

. The Court stated that:
There is much truth to the assertion that "procedural rights” are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressabilily and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency’s failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.
Lujan, 504 U.S. at 572 n. 7, 112 S.Ct. 2130 (emphasis added).

. A majority of the Eighth Circuit relied on the citizen-suit provisions of both the ESA and the APA, both of which were invoked by Defenders of Wildlife. See Defenders of Wildlife v. Hodel, 851 F.2d 1035, 1039 (8th Cir.1988). As lo "section 702 of tire Administrative Procedure Act (APA), 5 *261 U.S.C. §§ 702 (Supp. II 1982), which provides that persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute’ may bring suit to challenge a final agency action,” the Eighth Circuit held that "plaintiffs must show that ‘the challenged action! 1 caused them "injury in fact,” and that the alleged injury was to an interest "arguably within the zone of interests to be protected or regulated” by the statutes that the agencies were claimed to have violated.’ Sierra Club v. Morton, 405 U.S. at 733, 92 S.Ct. 1361.” Id. at 1039 n. 2. The court concluded that a procedural injury may be a cognizable injury in fact. See ul. at 1039-41, After concluding that Defenders had pleaded a procedural harm, the court applied traditional injury-in-fact test, finding that Defenders had standing. See icl. at 1041-44.
On remand, the Secretary again moved for summary judgment on the standing issue, which the district court denied, relying upon the Eighth Circuit's ruling that Defenders had standing. See id. (citing Defenders of Wildlife v. Hodel, 707 F.Supp. 1082 (D.Minn.1989)). On appeal, the Eighth Circuit affirmed, see id. (citing Defenders of Wildlife v. Lujan, 911 F.2d 117 (8th Cir.1990)), and the United States Supreme Court granted certiorari, see id.

. HRS § 343-2 (1993) defines 'council” as "die environmental council." The "office” is defined as "the office of environmental quality control.” Id. The office of environmental quality control “serve[s] the governor in an advisory capacity on all matters relating to environmental quality control.” HRS § 341-3(a). The council, as appointees of the governor, see HRS § 341—3(c), "shall serve as a liaison between the director [of the office of environmental quality control] and the general public by soliciting information, opinions, complaints, recommendations, and advice concerning ecology and environmental quality through public hearings or any other means and by publicizing such matters as requested by the director].]” HRS § 341-6. Additionally, as noted in HRS § 341-6, "[t]he council shall monitor the progress of state, county, and federal agencies in achieving die State's environmental goals and policies[.]” Thus, both the council and the office of environmental quality and control serve as a link between the public and the governor, and monitor state agencies for compliance with environmental policies.

. The language within HRS § 343-7(a) is unique. We observe that there is no state or federal statute using the phrase "[o]lhers, by court action, may be adjudged aggrieved!,]" HRS § 343-7(a), nor any substantially similar permutation of that phrase.

. The dissent, however, focuses on the word "aggrieved,” and, disregarding the plain distinction within HRS § 343-7(a), applies the unrestricted HAPA language, "[a]ny person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof!.]” HRS § 91-14. Although the dissent does not acknowledge the limitations on judicial review in HRS § 343-7(a), we observe that, had the legislature desired that this court interpret judicial review under HRS § 343-7(a) as broadly as that under HRS § 91-14, or any citizen suit provision upon which the dissent relies, it would surely have used the same language.

. In Bennett v. Spear, supra, the United States Supreme Court noted how broad this language is:
The first operative portion of the provision says that "any person may commence a civil suit”— an authorization of remarkable breadth when compared with the language Congress ordinarily uses. Even in some other environmental statutes, Congress has used more restrictive formulations, such as "[any person] having an interest which is or may be adversely affected,” 33 U.S.C. §§ 1365(g) (Clean Water Act); see also 30 U.S.C. §§ 1270(a) (Surface Mining Control and Reclamation Act) (same); "any person suffering legal wrong,” 15 . U.S.C. §§ 797(b)(5) (Energy Supply and Environmental Coordination Act); or "any person having a valid legal interest which is or may be adversely affected .. . whenever such action constitutes a case or controversy,” 42 U.S.C. §§ 9124(a) (Ocean Thermal Energy Conversion Act). And in contexts other than the environment, Congress has often been even more restrictive. In statutes concerning unfair trade practices and other commercial matters, for example, it has authorized suit only by "any person injured in his business or property,” 7 U.S.C. §§ 2305(c); see also 15 U.S.C. §§ 72 (same), or only by “competitors, customers, or subsequent purchasers,” §§ 298(b).
*264 520 U.S. at 164-65, 117 S.Ct. 1154. Unlike the authorization in the ESA, HRS § 343-7(a) is specific.

. HRS § 91-1 defines "rule" as "each agency statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any agency. The term does not include ... intra agency memoranda.”

. In light of the fact that we have decided that Petitioner lacks standing, we do not reach the merits of the case.

. HRS § 343-7(a) provides:
(a) Any judicial proceeding, the subject of which is the lack of assessment required under section 343-5, shall be initiated within one hundred twenty days of the agency’s decision to carry out or approve the action, or, if a proposed action is undertaken without a formal determination by the agency that a statement is or is not required, a judicial proceeding shall be instituted within one hundred twenty days after the proposed action is started. The council or office, any agency responsible for approval of the action, or the applicant shall be adjudged an aggrieved party for the purposes of bringing judicial action under this subsection. Others, by court action, may be adjudged aggrieved.
(Emphasis added.)

. The Tenth Circuit also held that the plaintiffs’ "recreational, aesthetic, and consumptive interests in the land and water” fell within the “zone of interests” that NEPA was designed to protect. Rio Hondo, 102 F.3d at 448.