Electronically Filed
Supreme Court
SCAP-14-0000843
27-MAY-2015
08:32 AM

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o—

REPRESENTATIVE BOB McDERMOTT, GARRET HASHIMOTO,
WILLIAM E.K. KUMIA, and DAVID LANGDON,
Plaintiffs-Appellants,

vs.

GOVERNOR DAVID IGE and VIRGINIA PRESSLER,
DIRECTOR, DEPARTMENT OF HEALTH, STATE OF HAWAI'I,
Defendants-Appellees.

SCAP-14-0000843

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-14-0000843; CIV. NO. 13-1-2899)

MAY 27, 2015

RECKTENWALD, C.J., NAKAYAMA, POLLACK, AND WILSON, JJ., AND
CIRCUIT JUDGE CASTAGNETTI, IN PLACE OF McKENNA, J., RECUSED

OPINION OF THE COURT BY RECKTENWALD, C.J.

This case requires us to determine whether Appellants have standing to challenge the Hawai'i Marriage Equality Act of 2013. The 2013 Act changed Hawaii's definition of marriage so

that same-sex couples could marry.  Appellants--State

Representative Bob McDermott, Garret Hashimoto, William E.K.

Kumia, and David Langdon--filed suit in the Circuit Court of the

First Circuit[1] to invalidate the 2013 Act.  The circuit court

upheld the Act's validity.

On appeal, Appellants claim that the 2013 Act is

unconstitutional under article I, section 23 of the Hawaiʻi

Constitution (also referred to as the "1998 marriage amendment"),

which provides:  "The legislature shall have the power to reserve

marriage to opposite-sex couples."  Haw. Const. art. I, § 23.

Specifically, Appellants argue that the 1998 marriage amendment

was adopted by the voters to constitutionally require the

legislature to reserve marriage to opposite-sex couples.

Before we consider the merits of Appellants' claims, we

must first determine whether they have standing to bring this

lawsuit.  Legal standing requirements promote the separation of

powers between the three branches of government by limiting the

availability of judicial review to cases involving an "injury in

fact."  Sierra Club v. Dep't of Transp., 115 Hawaiʻi 299, 319,

321, 167 P.3d 292, 312, 314 (2007); Sierra Club v. Hawaiʻi

Tourism Auth. Ex rel. Bd. of Dirs., 100 Hawaiʻi 242, 250-51, 59

P.3d 877, 885-86 (2002) (plurality opinion).  To have standing, a

---

[1]     The Honorable Karl K. Sakamoto presided.

plaintiff must show that he or she has suffered an actual or threatened injury that is fairly traceable to the defendant's actions, and that a favorable decision would likely provide relief for that injury.  See, e.g., Sierra Club v. Dep't of Transp., 115 Hawaiʻi at 314, 167 P.3d at 321.

We hold that Appellants have failed to establish standing to bring this lawsuit.  The legislature's decision to extend the right to marry to same-sex couples does not, in any way, diminish the right to marry that Appellants remain free to exercise.  Although it appears Appellants have deeply-held objections to same-sex marriage, such moral or ideological disapproval does not constitute a legally cognizable injury sufficient to establish standing.

Because Appellants do not have standing to challenge the constitutionality of the Marriage Equality Act, we vacate the circuit court's order granting summary judgment and remand the case to the circuit court with instructions to dismiss the case for lack of jurisdiction.

## I.  Background

### A.  Background to article I, section 23 of the Hawaiʻi Constitution and the Marriage Equality Act

In 1991, three same-sex couples filed a lawsuit in the circuit court against John C. Lewin, then-Director of the Hawaiʻi Department of Health (DOH), challenging the DOH's practice of

restricting marriage licenses to opposite-sex couples.  Baehr v. Lewin, 74 Haw. 530, 535-37, 852 P.2d 44, 48-49 (1993) (Baehr I). The plaintiffs in Baehr I alleged that Hawai'i Revised Statutes (HRS) § 572-1 was unconstitutional as construed by the DOH.[2]  Id. On appeal, this court held that both on its face and as applied by the DOH, HRS § 572-1 established a sex-based classification, which would violate the equal protection clause of the Hawai'i Constitution unless the strict scrutiny test was met, and remanded the case to the circuit court to determine whether the State could meet its burden of showing that the statute "furthers compelling state interests and is narrowly drawn to avoid unnecessary abridgments of constitutional rights."  Id. at 580, 582, 852 P.2d at 67, 68.

---

[2]     At the time this court decided Baehr I, HRS § 572-1 provided, in relevant part:

> In order to make valid the marriage contract, it shall be necessary that:
>
> . . .
>
>> (3) The man does not at the time have any lawful wife living and that the woman does not at the time have any lawful husband living;
>
> . . .
>
>> (7) The marriage ceremony be performed in the State by a person or society with a valid license to solemnize marriages and the man and woman to be married and the person performing the marriage ceremony be all physically present at the same place and time for the marriage ceremony.

HRS § 572-1 (1985) (emphases added).

In 1994, while the remanded <u>Baehr</u> case was again before the circuit court, the legislature amended Hawaii's definition of marriage in HRS § 572-1 to specify that Hawaii's marriage licensing laws only allowed marriage between opposite-sex couples.  1994 Haw. Sess. Laws Act 217 at 526.  The amended HRS § 572-1 stated that the marriage contract "shall be only between a man and a woman . . . ."  HRS § 572-1 (2006).

Meanwhile, on remand, the circuit court held that the State's traditional definition of marriage did not meet strict scrutiny, and the State appealed.  <u>Baehr v. Miike</u>, No. 91-1394, 1996 WL 694235, at *21-22 (Dec. 3, 1996).

In 1997, while the appeal was pending, the legislature proposed an amendment to the Hawaiʻi Constitution.  <u>See</u> 1997 Haw. Sess. Laws HB 117 at 1246-47.  Representative McDermott voted in support of the amendment when it came before the House.  The proposed amendment was submitted to the general public as a ballot question in the November 3, 1998 general election.  The question on the ballot asked:  "Shall the Constitution of the State of Hawaii be amended to specify that the legislature shall have the power to reserve marriage to opposite-sex couples?"

Before the election, the State of Hawaiʻi Office of Elections released a fact sheet, which included explanations of the consequences of a "yes" vote and a "no" vote.  The fact sheet stated that "[t]he proposed amendment is intended to make it

5

absolutely clear that the State Constitution gives the Legislature the power and authority to reserve marriage to opposite-sex couples." The fact sheet went on to explain that a "yes" vote would "add a new provision to the Constitution that would give the Legislature the power to reserve marriage to opposite-sex couples only. The legislature could then pass a law that would limit marriage to a man and a woman, overruling the recent Supreme Court decision regarding same-sex couples." The fact sheet also explained that a "no" vote "will make no change to the Constitution of the State of Hawaiʻi, and allow the court to resolve the lawsuit that has been brought against the State."

Over two-thirds of the voters voted in favor of the amendment, and article I, section 23 of the constitution was added to read: "The legislature shall have the power to reserve marriage to opposite-sex couples." Haw. Const. art. I, § 23. After the 1998 marriage amendment was ratified, the legislature did not re-enact legislation defining marriage as between a man and a woman, presumably because the then-existing version of HRS § 572-1 already limited marriage to opposite-sex couples. See HRS § 572-1 (1993) (amended 1994, 1997, 2012, 2013).[3]

---

[3]  The 1997 and 2012 amendments to HRS § 572-1 are not relevant to the present appeal. In 1997, the legislature amended the statute by replacing the phrase "legitimate or illegitimate" with "the result of the issue of parents married or not married to each other." 1997 Haw. Sess. Laws Act 52, § 5 at 97. In 2012, the legislature added language to HRS § 572-1 to ensure consistency with Hawaii's 2011 law recognizing civil unions. 2012 Haw. Sess. Laws Act 267, § 4 at 945-46.

6

On December 9, 1999, this court issued a summary disposition order stating that the 1998 marriage amendment had "tak[en] the [marriage] statute out of the ambit of the equal protection clause of the Hawaiʻi Constitution," and therefore "HRS § 572-1 must be given full force and effect." Baehr v. Miike, No. 20371, 1999 WL 35643448, at *1 (Haw. Dec. 9, 1999) (SDO) (Baehr II).

The 1994 statutory definition of marriage in HRS § 572-1 remained unchanged in pertinent part until November 2013. On October 28, 2013, the legislature began a special session to consider Senate Bill 1 (SB 1). SB 1 was signed into law on November 13, 2013, as the Hawaiʻi Marriage Equality Act of 2013. The Marriage Equality Act changed the definition of marriage so that "the marriage contract . . . shall be permitted between two individuals without regard to gender," thereby permitting same-sex marriage. HRS § 572-1 (Supp. 2014).

B.   **Prior Proceedings in the Present Case**

On October 30, 2013, while the legislature was considering SB 1, Representative McDermott filed a complaint in the circuit court. On November 1, 2013, a first amended complaint joined as plaintiffs Hashimoto, Kumia, and Langdon. Appellants originally named as defendants the Governor and four legislators. After the Marriage Equality Act was signed into law, the legislators were removed as parties and the Director of

7

the DOH was added, and the case proceeded against the Governor and the Director of the DOH (Appellees).

On November 4, 2013, Appellants moved for a Temporary Restraining Order (TRO) to enjoin the State from issuing any marriage licenses to same-sex couples. Appellants first argued that they were likely to succeed on the merits. Appellants acknowledged that based on the 1998 marriage amendment, the legislature only possessed the authority to limit marriage to opposite-sex couples by statute if it chose to do so, but argued that at the time the public voted, the legislature had already chosen to do so in HRS § 572-1. According to Appellants, this indicates that the intent of the voters in 1998 was to validate the existing statute, and reserve marriage to opposite-sex couples only. Thus, according to Appellants, before amending the statute to allow same-sex marriage, the legislature would have to again ask the public to amend the constitution.

Appellants next argued that, based on experiences in other states, they would suffer irreparable injury if SB 1 became law:

> Once same-sex marriages were approved in
> Massachusetts, parents there were faced with rulings
> that the schools had a duty to portray homosexual
> relationships as normal, and the complaints of parents
> were ignored. Further, businesses in Massachusetts
> were faced with equally serious situations involving,
> for example, disruptions and expenses caused by
> "testing for tolerance" by homosexual activists.

Finally, Appellants argued that the public interest

favored granting the injunction because:

> [t]he public has a strong vested interest in knowing that the very basis of Hawaii's cultural norms, the family, which consists of a mother, father and children (and perhaps includes several generations), will be forever changed.  To see the depth of that vested interest, one needs to go no further than to consider the thousands and thousands of citizens that met and rallied at the Capitol Building on October 28, 2013 to oppose any change to Section 572-1 that would validate same-sex marriages.  These citizens were from every walk of life.  They were Hawaiians, Polynesians, Asians, African Americans and Caucasians. They were young and old, and all they wanted was to tell the legislators:  "Let the people vote."  There is a cultural norm involved, and a change in that historic cultural norm should not be changed and mandated by a law that is opposed by the vast majority of Hawaii's citizens.  The adverse societal impacts and the great public interest should be obvious to the Court.

On November 5, 2013, Appellees responded by arguing that the court lacked the authority to grant Appellants' motion because enjoining the legislature from enacting a bill or the governor from signing it would violate the separation of powers doctrine and the political question doctrine, and that Appellants' action against a bill rather than a law was not ripe.

Appellees also argued that Appellants lacked standing. According to Appellees, Representative McDermott lacked standing as a legislator suing in his official capacity because an individual legislator does not have standing based solely on his or her status as a legislator, and is required to show a personal stake and a concrete injury to establish standing.  Appellees argued that the only exception to this rule--where legislators whose votes would have been sufficient to pass or defeat a

9

specific bill sue because their votes were "nullified"--does not apply here because Representative McDermott has not shown that there were enough votes to defeat the bill or that his vote had been nullified. Appellees also argued that Hashimoto, Kumia, and Langdon (the "Individual Plaintiffs") lacked standing because they were attempting to assert a "value preference" which was insufficient to show a concrete injury-in-fact.

Appellees also argued that even if the case was properly before the court, Appellants could not show a likelihood of success on the merits. Appellees argued that the language of article I, section 23 clearly and unambiguously permits, but does not require, the legislature to limit marriage to opposite-sex couples. Thus, according to Appellees, article I, section 23 did not limit the legislature's authority to enact the Marriage Equality Act.

Appellees also contended that even if the language of article I, section 23 is ambiguous, the legislative history and the factual circumstances surrounding the 1998 marriage amendment supported Appellees' interpretation of the provision. Specifically, Appellees argued that a reasonable voter would have understood that the 1998 marriage amendment did not require the legislature to limit marriage to opposite-sex couples, but merely gave the legislature the authority to act if it chose to do so.

In response to Appellees' claim that Appellants lacked

standing, Appellants argued that because they were bringing a declaratory action in a matter of great public importance, the traditional standing requirements were not applicable. Appellants also argued that Representative McDermott had standing as a legislator because prior to the 1998 marriage amendment, he had represented publicly that "a 'Yes' vote would allow the Constitution to be amended, so that the prior law . . . (that reserved marriage to heterosexual couples only) would be Constitutionally established and would be valid." Therefore, according to Appellants, absent an injunction, Representative McDermott would "suffer irreparable damages to his reputation and to his electability as a legislator, which is his livelihood, because his actions and speeches prior to the 1998 vote will have been and will be deemed by the electorate to be misleading and untruthful."

On November 7, 2013, the circuit court denied Appellants' motion on the grounds that enjoining the signing of the bill would be a violation of the separation of powers doctrine, was a political question, and was not ripe, but also stated that it would hear further arguments on the impact of SB 1 if the Governor signed the bill into law.

In a supplemental memorandum, Appellants argued that Appellees should be estopped from arguing that article I, section 23 merely gave the legislature the power to limit marriage to

11

opposite-sex couples if it chose to do so because according to Appellants, Appellees' interpretation is contrary to the information the State had given in its Ballot Information Flyer before the general election vote on the 1998 marriage amendment. The Ballot Information Flyer stated, in relevant parts:

> The proposed amendment is intended to make it absolutely clear that the State Constitution gives the Legislature the power and authority to reserve marriage to opposite-sex couples.
>
> . . . .
>
> A "Yes" vote would add a new provision to the Constitution that would give the legislature the power to reserve marriage to opposite-sex couples only. The legislature could then pass a law that would limit marriage to a man and a woman, overruling the recent Supreme Court decision regarding same-sex couples.
>
> . . . .
>
> A "No" vote will make no change to the Constitution of the State of Hawaiʻi and allow the court resolve the lawsuit that has been brought against the State.

On November 14, 2013, the day after the Marriage Equality Act was signed into law, the circuit court held another hearing on Appellants' motion for a TRO and preliminary injunction.[4]

Appellants clarified that their argument was not that article I, section 23 required the legislature to define marriage as between opposite-sex couples, but that once the legislature exercised its power conferred by article I, section 23, the

---

[4] Although Appellants' motion was entitled a motion for TRO, the circuit court held a hearing on "Plaintiffs' Motion for Temporary Restraining Order & Preliminary Injunction."

legislature no longer had other powers to define marriage without amending the constitution.

Appellees argued that regardless of article I, section 23, the legislature has the power under article 3, section 1[5] to enact the Marriage Equality Act.

The circuit court found that Appellants had standing, and concluded verbally as follows:

> The court believes that the plaintiffs, both as citizens and voters in matters of great public importance, have a personal stake in the outcome of this controversy and thereby have standing arising from what the court believed was an attempt to expand Article I, section 23 to include same sex marriage.

The circuit court then went on to conclude that article I, section 23 empowered the legislature to limit marriage to opposite-sex couples, but that the legislature could choose not to exercise that power, and that, separate from article I, section 23, the legislature had the power to define marriage pursuant to article III, section 1. Thus, the circuit court concluded that the Marriage Equality Act did not violate article I, section 23, and that "same sex marriage in Hawaiʻi is legal."

On December 20, 2013, the circuit court entered an order granting in part and denying in part Appellants' motion for

_____

[5]     Article 3, section 1 of the Hawaiʻi Constitution provides that "[t]he legislative power of the State shall be vested in a legislature, which shall consist of two houses, a senate and a house of representatives. Such power shall extend to all rightful subjects of legislation not inconsistent with this constitution or the Constitution of the United States."

13

a TRO and preliminary injunction.[6]

On December 23, 2013, Appellees filed a motion for summary judgment (MSJ).  Appellees again argued that Representative McDermott lacked standing in his official capacity as a legislator, and the Individual Plaintiffs all lacked standing because they had suffered no injury-in-fact as a result of the passage of the law.

In response, Appellants argued that Representative McDermott has standing in his official capacity as a legislator, and that summary judgment should be denied because "[a]s a minimum, there is a serious issue of material fact whether the individual Plaintiffs' constitutional due process voting rights have been abridged by the State's 'bait and switch' tactic." This "bait and switch" referred to Appellants' argument that the State's interpretation of the 1998 marriage amendment in the present case is contrary to the position it presented in the Ballot Information Flyer for the 1998 ballot question. Appellants argued that the "bait and switch" should estop Appellees from asserting their arguments and that it conferred

---

[6]    Appellants' motion was

GRANTED to the extent of Plaintiffs' declaratory relief, as Article I, Section 23 empowers the legislature to reserve marriage to opposite-sex couples, but does not give the legislature the power to constitutionally recognize marriage to same-sex couples under Article I, Section 23; and DENIED to the extent Plaintiffs sought injunctive relief.

14

standing on the Individual Plaintiffs.  Appellants also argued that they have standing as private citizens because the lawsuit they brought was a matter of great public importance.

On January 29, 2014, the circuit court ruled that the Marriage Equality Act was constitutional, and on April 21, 2014, entered an order granting Appellees' MSJ.  The circuit court concluded that the language of article I, section 23 is clear and unambiguous, and gives the legislature the power to reserve marriage to opposite-sex couples, but does not demand it.  The circuit court also concluded that the legislative history and factual circumstances surrounding the 1998 marriage amendment supported its interpretation of the amendment's plain language.

On May 21, 2014, Appellants appealed, and on July 16, 2014, this court granted Appellees' transfer application.  On appeal, Appellants challenge the circuit court's denial of Appellants' motion for a TRO and preliminary injunction, and granting of Appellees' MSJ.

## II.  Standard of Review

Whether the plaintiff had standing to bring his or her claim presents a question of law, reviewable de novo.  Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n, Inc., 113 Hawaiʻi 77, 90, 148 P.3d 1179, 1192 (2006); see also Keahole Def. Coal., Inc. v. Bd. of Land & Natural Res., 110 Hawaiʻi 419, 427-28, 134 P.3d 585, 593-94 (2006).  Further, standing must be addressed before we

15

reach the merits, and "may be addressed at any stage of a case." Keahole Def. Coal., Inc., 110 Hawaiʻi at 427, 134 P.3d at 593.

### III.  Discussion

### A.  Legal Standing is a Requirement that Cannot be Waived

At every stage of the proceedings before the circuit court, Appellees argued that Appellants lacked standing.  The circuit court concluded that Appellants did have standing upon finding that this case presents a matter of great public importance and that by passing the Marriage Equality Act of 2013, the legislature was attempting to expand the scope of article I, section 23.  Appellees have not cross-appealed the circuit court's finding that Appellants had standing, because Appellees prevailed on the merits and, according to Appellees, "'only a party aggrieved by a judgment can appeal from it.'"  (Citing In re Campbell's Estate, 46 Haw. 475, 498, 382 P.2d 920, 941 (1963)).

Appellants argue that because Appellees did not cross-appeal the circuit court's ruling on standing, Appellees have waived any argument on this issue.  However, this court has the independent obligation to address whether Appellants have standing to bring these claims.  See Keahole Def. Coal., Inc., 110 Hawaiʻi at 427, 134 P.3d at 593 ("The issue of standing implicates this court's jurisdiction, and, therefore, must be addressed first.").  If this court concludes that Appellants

16

lacked standing, this court must dismiss the appeal without reaching the merits of the case. See, e.g., Sierra Club v. Hawaiʻi Tourism Auth. ex rel. Bd. of Dirs., 100 Hawaiʻi 242, 265 & n.35, 59 P.3d 877, 900 & n.35 (2002) (plurality opinion) (holding that "[i]n light of the fact that we have decided that Petitioner lacks standing, we do not reach the merits of the case" and that "having held that Petitioner lacks standing to bring its suit, we dismiss Petitioner's . . . Petition").

Indeed, we must address standing as a threshold matter, even if it is not raised by the parties. See Akinaka v. Disciplinary Bd. of Hawaiʻi Supreme Court, 91 Hawaiʻi 51, 55, 979 P.2d 1077, 1081 (1999) ("Although neither the parties nor the trial court considered the question of standing, this court has a duty, sua sponte, to determine whether [the plaintiff] had standing to prosecute his complaint against appellees.").

The requirements that a party must have legal standing to litigate a claim, and that a lack of standing is a defect that must be addressed by the court at any point in the case, serve several purposes that are fundamental in ensuring the effective role of the courts in our society. Legal standing requirements promote the separation of powers between the three branches of government by limiting the availability of judicial review to cases in which there is an actual dispute between adverse parties, which "focuses attention directly on the question of

17

what is the proper place of the judiciary in the American system of government." Erwin Chemerinsky, Federal Jurisdiction 57-58 (4th ed. 2003).

This is particularly important where, as in this case, one party claims that action taken by another branch of government was unconstitutional. Raines v. Byrd, 521 U.S. 811, 819-20 (1997). For example, this court noted in Life of the Land v. Land Use Comm'n of State of Haw., that "even in the absence of constitutional restrictions [on justiciability],[7] courts still carefully weigh the wisdom, efficacy, and timeliness of an exercise of their power before acting, especially where there may be an intrusion into areas committed to other branches of government." 63 Haw. 166, 172, 623 P.2d 431, 438 (1981). In Trustees of Office of Hawaiian Affairs v. Yamasaki, this court further explained that we must be wary of the "inappropriateness of judicial intrusion into matters which concern the political branch of government," and that "too often, courts in their zeal to safeguard their prerogatives overlook the pitfalls of their

---

[7] Unlike the federal courts, the courts of Hawaiʻi are not subject to the "cases or controversies" limitation imposed by Article III, Section 2 of the U.S. Constitution. Nevertheless, because the Hawaiʻi government, like the federal government, is "divided and allocated among three co-equal branches," Trustees of Office of Hawaiian Affairs v. Yamasaki 69 Haw. 154, 170-71, 737 P.2d 446, 456 (1987), this court has established a set of "'prudential rules' of judicial self governance" to properly limit the role of the courts in our society, and has looked to decisions of the U.S. Supreme Court for guidance on these rules, Life of the Land, 63 Haw. at 171-73, 623 P.2d at 438-39; see also Reliable Collection Agency, Ltd. v. Cole, 59 Haw. 503, 510-11, 584 P.2d 107, 111 (1978).

own trespass on legislative functions." 69 Haw. 154, 172, 737 P.2d 446, 456-57 (1987) (citations, quotation marks, and brackets omitted). Thus, a judicial determination of the constitutionality of a statute without an actual dispute between genuinely adverse parties could constitute an unwarranted encroachment into the authority of the legislative branch of government.

In addition, legal standing requirements improve judicial decision-making by ensuring that the parties before the court have a sufficient personal stake in the outcome to effectively and zealously argue the merits. See Baker v. Carr, 369 U.S. 186, 204 (1962) (stating that the "gist of the question of standing" is whether "the appellants [have] alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions").

We note that, although standing requirements are important to serve the policies described above, this court has also indicated that the standing doctrine should not create a barrier to justice where one's legitimate interests have, in fact, been injured. See East Diamond Head Ass'n v. Zoning Bd. of Appeals of City & Cnty. of Honolulu, 52 Haw. 518, 523 n.5, 479 P.2d 796, 799 n.5 (1971) (quoting Kenneth Davis, The Liberalized

19

Law of Standing, 37 U. Chi. L. Rev. 450, 473 (1970))

("Complexities about standing are barriers to justice; in removing the barriers the emphasis should be on the needs of justice. One whose legitimate interest is in fact injured by illegal action of an agency or officer should have standing because justice requires that such a party should have a chance to show that the action that hurts his interest is illegal.").

However, the application of our standing doctrine in this case does not create a barrier to justice. Appellants have not been deprived of any right and have not, as discussed below, pointed to any legally-recognized interest that has been injured. Indeed, Appellants are seeking standing to challenge the legislature's extension of the right to marriage to people who, previously, could not exercise that right. Therefore, this is not a case in which justice requires us to relax our standing requirements.

Accordingly, this court must, and will, address the issue of Appellants' standing before considering the merits of Appellants' constitutional argument.

## B. Appellants Lack Standing to Challenge the Constitutionality of the Marriage Equality Act

The critical inquiry in determining standing is "'whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his [or her] invocation

of . . . [the court's] jurisdiction and to justify exercise of the court's remedial powers on his [or her] behalf.'" Life of the Land, 63 Haw. at 172, 623 P.2d at 438 (quoting Warth v. Seldin, 422 U.S. 490, 498-99 (1975)). Generally, whether a plaintiff has the requisite "personal stake" is evaluated using the three-part injury-in-fact test. Sierra Club v. Hawaiʻi Tourism Auth., 100 Hawaiʻi at 250-51, 59 P.3d at 885-86. Under this test, a plaintiff must allege that: (1) he or she has suffered an actual or threatened injury as a result of the defendant's wrongful conduct; (2) the injury is fairly traceable to the defendant's actions; and (3) a favorable decision would likely provide relief for the plaintiff's injury. Id.

Once the standing of one plaintiff is established, the court can proceed to a decision on the merits of the case and need not determine whether the other Appellants also have standing. See Planned Parenthood of Idaho, Inc. v. Wasden, 376 F.3d 908, 918 (9th Cir. 2004) ("Where the legal issues on appeal are fairly raised by one plaintiff who had standing to bring the suit, the court need not consider the standing of the other plaintiffs.") (internal brackets and quotation marks omitted).

Thus, we look to see if any of the Appellants have established standing. We will first address the Appellants' argument that they have standing based on the fact that this is a matter of great public importance, and will then examine whether

21

the Appellants have otherwise satisfied the requirements of the injury-in-fact test.

**1.  Appellants Cannot Establish Standing Solely on the Grounds That This is a Matter of Great Public Importance**

Appellants argued before the circuit court that standing requirements should be relaxed or completely eliminated in this case because it is a matter of great public importance. Specifically, Appellants argued that:

> The complexities of standing and ripeness standards are considered to be barriers to justice, and when a court considers removing those barriers, the emphasis is placed on the needs of justice. More specifically, those justiciability standards are simply not applicable in declaratory judgment actions involving matters of great importance. Thus, those standards are not applicable and are not barriers in this case.

(Internal citations omitted).

The circuit court generally agreed with Appellants and concluded that:

> The court believes that the Plaintiffs, both <u>as citizens and voters in matters of great public importance</u>, have a personal stake in the outcome of this controversy and thereby have standing arising from what the court believed was an attempt to expand Article I, section 23 to include same sex marriage.

(Emphasis added).

Before this court, Appellants do not elaborate further on their argument that they have standing because this is a matter of great public importance. However, because this was at least a partial basis for the circuit court's conclusion, we address it as a possible basis for Appellants' standing.

22

This court has never based standing solely on the grounds that a matter was of great public importance. Instead, in two narrow types of cases--those involving native Hawaiian rights and environmental concerns--this court has expanded the requisite "injury" to include harms to aesthetic and environmental well-being and where a plaintiff's harm is shared by a large portion of the population generally. Critically though, this court has always required the plaintiff to show some injury-in-fact.

This court's expansion of standing in certain cases can be traced back to East Diamond Head Ass'n, 52 Haw. at 518, 479 P.2d at 796. In East Diamond Head Ass'n, this court held that the plaintiffs, landowners of a lot adjacent to which a variance for industrial use had been granted in a residentially-zoned area, had standing as "aggrieved persons" under HRS § 91-14(a)[8] to challenge the variance. Id. at 522, 479 P.2d at 798. In so holding, this court stated that:

> In this case we subscribe to Professor Davis' common sense position on standing requirements:
>
> "Complexities about standing are barriers to justice; in removing the barriers the emphasis should be on the needs of justice. One whose legitimate interest is in fact injured by illegal action of an agency or officer should have standing because justice requires that such a party should have a chance to show that the

---

[8]     HRS § 91-14(a) (Supp. 2014) provides, in relevant part:  "Any person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter . . . ."

action that hurts his interest is illegal."

Id. at 523 n.5, 479 P.2d at 799 n.5 (quoting Kenneth Davis, The Liberalized Law of Standing, 37 U. Chi. L. Rev. 450, 473 (1970)) (emphasis added).

Even at the genesis of this expansion of standing, it was thus clear from the language quoted by this court that we would still require the plaintiff to show an injury-in-fact to a legitimate interest to establish standing, while also not allowing procedural standing complexities to create a barrier to justice.

Since East Diamond Head Ass'n, this court has expanded what constitutes an injury-in-fact to include not just economic harms, but also harm to "aesthetic and environmental well being" and cases where the plaintiff's injury "is not different in kind from the public's generally, if he or she can show that he or she has suffered an injury-in-fact." Sierra Club v. Hawaiʻi Tourism Auth. ex rel. Bd. of Dirs., 100 Hawaiʻi 242, 251, 59 P.3d 877, 886 (2002) (internal brackets omitted); see also Sierra Club v. Dep't of Transp., 115 Hawaiʻi 299, 313, 167 P.3d 292, 320 (2007) ("environmental plaintiffs must meet the three-part standing test . . . although there will be no requirement that their asserted injury be particular to the plaintiffs, and the court will recognize harms to plaintiffs [sic] environmental interests as

24

injuries that may provide the basis for standing").[9]  This

court's expansion of standing in such cases is based, at least in

part, on article XI, section 9 of the Hawaiʻi Constitution, which

creates a right in "each person" to a "clean and healthful

environment."[10]  Sierra Club v. Dep't of Transp., 115 Hawaiʻi at

320, 167 P.3d at 313 ("The less rigorous standing requirement

this court applies in environmental cases draws support from the

Hawaiʻi Constitution, article XI, section 9.").  However, as this

court noted in Sierra Club v. Hawaiʻi Tourism Auth., "while the

basis for standing has expanded in cases implicating

environmental concerns and native Hawai[]ian rights, plaintiffs

---

[9]     See also Ka Paʻakai O Kaʻaina v. Land Use Comm'n, State of Hawaiʻi, 94 Hawaiʻi 31, 42-44, 7 P.3d, 1068, 1079-81 (2000) (plaintiff organization which sued to prevent development of a parcel of land had standing to challenge the Land Use Commission's decision because members of the organization alleged the development would impair their use and enjoyment of pristine nature, scenic views, and open coastline of the area); Citizens for Protection of North Kohala Coastline v. Cnty. of Hawaiʻi, 91 Hawaiʻi 94, 100-02, 979 P.2d 1120, 1126-28 (1999) (plaintiff group established standing to challenge the construction of a coastline resort by contending that they used the area for picnics, swimming, boating, fishing, and spiritual activities, and that the proposed resort threatened the plaintiffs' quality of life through irreversible degradation of the coastline and marine environment); Pele Defense Fund v. Puna Geothermal Venture, 77 Hawaiʻi 64, 70, 881 P.2d 1210, 1216 (1994) (organizations and individuals that sued challenging an agency's decision to grant a permit for geothermal wells established standing by alleging the permits would diminish their property values, cause an odor nuisance, and reduce air quality).

[10]     Article XI, section 9 of the Hawaiʻi Constitution provides in full:

> Each person has the right to a clean and healthful
> environment, as defined by laws relating to
> environmental quality, including control of pollution
> and conservation, protection and enhancement of
> natural resources.  Any person may enforce this right
> against any party, public or private, through
> appropriate legal proceedings, subject to reasonable
> limitations and regulation as provided by law.

must still satisfy the injury-in-fact test."  100 Hawaiʻi at 251, 59 P.3d at 886 (emphasis added).

Therefore, even acknowledging that marriage equality is a matter of great public importance, Appellants cannot establish standing based solely on this basis.  Rather, they must establish that they otherwise satisfy the injury-in-fact test, and in particular, whether they have suffered an actual or threatened injury.

2.  **Representative McDermott's Status as a State Legislator Who Voted for HB 117 in 1997 Does Not Establish an Injury-in-Fact**

Appellees argue that an individual's status as a legislator does not, on its own, confer standing to challenge a law, and that a legislator establishes standing only by showing: (1) a sufficient "personal stake" and "concrete injury" in the outcome of the litigation (just like any other plaintiff); or (2) a deprivation of his or her right to vote in the legislature, or that his or her legislative vote has been "nullified" by the defendants.  According to Appellees, for Representative McDermott to demonstrate legislative standing on this second basis, he would have to demonstrate that he voted against SB 1, there were sufficient votes to defeat SB 1, and that due to some nullification of his vote, SB 1 nonetheless was deemed passed.

In response, Appellants argue that it is not Representative McDermott's vote against SB 1 that is at issue,

26

but instead his vote in 1997 for HB 117, which was the bill that proposed the ballot question for the 1998 marriage amendment. Appellants argue that Representative McDermott voted for HB 117 with the "firm conviction that the [1998] Marriage Amendment . . . would allow only opposite sex couples to marry in the State of Hawaiʻi." According to Appellants, the legislature's enactment of the Marriage Equality Act abrogated the 1998 marriage amendment, and in doing so the legislature nullified Representative McDermott's legislative vote in favor of HB 117.

Cases decided by the U.S. Supreme Court and this court do not support Appellants' argument that Representative McDermott has established legislative standing. Instead, these cases show that, although a legislator may indeed have standing to challenge a law if his or her vote was nullified or if he or she was unlawfully deprived of the right to vote, Representative McDermott simply has not shown the requisite deprivation or nullification that is required to establish such standing.

In <u>Coleman v. Miller</u>, twenty Kansas state legislators voted to ratify a constitutional amendment, and twenty voted against ratification. 307 U.S. 433, 435-36 (1939). The Kansas Lieutenant Governor cast the deciding twenty-first vote in favor of ratification and the legislators who lost the vote then sued to compel state officials to recognize that the amendment had not been properly ratified. <u>Id.</u> at 436. The U.S. Supreme Court held

27

that the legislators had standing because

> [h]ere, the plaintiffs include twenty senators, whose votes against ratification have been overridden and virtually held for naught although if they are right in their contentions their votes would have been sufficient to defeat ratification. We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes.

Id. at 438.

In Raines v. Byrd, the U.S. Supreme Court addressed the issue of whether four Senators and two Congressmen who all voted "nay" in 1996 on the Line Item Veto Act had standing to file a lawsuit challenging the constitutionality of the act after it was passed. 521 U.S. 811, 813-14 (1997). The Line Item Veto Act gave the President the authority to cancel certain spending and tax measures after signing them into law. Id. at 814. The Senate passed the bill for the act by 69 votes to 31, and the House passed the identical bill by a vote of 232 to 177. Id. The Court first reiterated that a plaintiff must suffer a "particularized" injury which affects the plaintiff in a personal and individual way. Id. at 819 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). The Court then held that the legislator-plaintiffs did not have a sufficient "personal stake" in the dispute and had not alleged a sufficiently "concrete injury" to establish standing. Id. at 830. In so holding, the Court examined its previous decision in Coleman. The Raines Court explained:

28

> [O]ur holding in Coleman stands . . . for the
> proposition that legislators whose votes would have
> been sufficient to defeat (or enact) a specific
> legislative Act have standing to sue if that
> legislative action goes into effect (or does not go
> into effect), on the ground that their votes have been
> completely nullified.
>
> It should be equally obvious that appellees' claim [in
> Raines] does not fall within our holding in Coleman,
> as thus understood.  They have not alleged that they
> voted for a specific bill, that there were sufficient
> votes to pass the bill, and that the bill was
> nonetheless deemed defeated.

Id. at 823-24.

The Raines Court also addressed the legislator-plaintiffs' argument that, under Coleman, they had standing because their future votes on appropriations bills would be less effective because the President now had the power to veto certain measures.  Id. at 825.  The Court refused to expand Coleman this far because

> [a]ppellees' use of the word "effectiveness" to link
> their argument to Coleman stretches the word far
> beyond the sense in which the Coleman opinion used it.
> There is a vast difference between the level of vote
> nullification at issue in Coleman and the abstract
> dilution of institutional legislative power that is
> alleged here.

Id. at 825-26.

Appellees in the case at bar contend that the principles set forth by the U.S. Supreme Court in Raines and Coleman are also followed in Hawaiʻi.

In Mottl v. Miyahira, two of the plaintiffs challenging a reduction in the University of Hawaii's allotted funds were legislators who argued that they had standing because they "have

29

not only the interest of a general member of the public in seeing that the laws of the state are complied with, but the interest of persons who have spent their own official time on behalf of their constituents, reviewing, voting on, and enacting budgets that become law." 95 Hawaiʻi 381, 392, 23 P.3d 716, 727 (2001). This court held that the legislator-plaintiffs did not have standing because "[t]hey have not alleged any 'personal stake in the outcome of the controversy,' inasmuch as they have not alleged that they had personally suffered any 'distinct and palpable injury.'" Id.

In Hanabusa v. Lingle, two state senators who had voted in favor of an act that modified the appointment process for members of the University of Hawaiʻi Board of Regents (BOR) brought an action to compel the governor to nominate six candidates to replace holdover members of the BOR. 119 Hawaiʻi 341, 346, 198 P.3d 604, 609 (2008). The senators contended that by refusing to nominate six new names, the governor was denying the senators their constitutional power and duty to advise and consent regarding the nominees. Id. The governor argued that, under Mottl, the senators lacked standing. Id. at 348, 198 P.3d at 611. However, this court distinguished Mottl and held that the senators had standing on the grounds that the "allegation that [the senators'] right to advise and consent on BOR appointments has been usurped by [the governor] . . . is

30

sufficiently personal to constitute an injury in fact."  Id.

Several principles can be drawn from these cases of the U.S. Supreme Court and Hawai'i Supreme Court.  First, a legislator does not, merely by virtue of voting on an act, have standing to challenge the constitutionality of the act.  Second, to have standing, a legislator must establish that he or she has suffered a distinct and palpable injury resulting from the passing of (or failure to pass) the law being challenged.  Third, this requisite injury for legislators may arise if the legislator's right to vote on a bill has somehow been nullified, usurped, or the legislator's vote has subsequently been rendered ineffective.  These cases do not, however, support standing for a legislator who simply does not prevail in the vote count.

In the present case, Appellants argue that Representative McDermott's vote in 1997 in favor of HB 117 was nullified by the legislature enacting the Marriage Equality Act in 2013.  In essence, Appellants' argument is that Representative McDermott voted for HB 117 under the belief that the proposed constitutional amendment would limit marriage to opposite-sex couples in a way that could not be undone by the legislature through its customary and ordinary powers, but that the legislature's determination in 2013 that the 1998 marriage amendment did not inhibit its customary and ordinary power to enact the Marriage Equality Act nullified Representative

31

McDermott's 1997 vote in favor of HB 117.  This is unpersuasive.

Representative McDermott voted in favor of HB 117,

which provided, in relevant part:

> SECTION 1.  The purpose of this Act is to propose an amendment to article I of the Constitution of the State of Hawaii, <u>to clarify that the legislature has the power to reserve marriage to opposite-sex couples.</u>
>
> The legislature finds that the unique social institution of marriage involving the legal relationship of matrimony between a man and a woman is a protected relationship of fundamental and unequaled importance to the State, the nation, and society.  The legislature further finds that the question of whether or not the state should issue marriage licenses to couples of the same sex is a fundamental policy issue <u>to be decided by the elected representatives of the people</u>.  This constitutional measure is thus designed to confirm that the legislature has the power to reserve marriage to opposite-sex couples <u>and to ensure that the legislature will remain open to the petitions of those who seek a change in the marriage laws</u>, and that such petitioners can be considered on an equal basis with those who oppose a change in our current marriage statutes.
>
> SECTION 2.  Article I of the Constitution of the State of Hawaii is amended by adding a new section to be designated and to read as follows:
>
> . . . .
>
> ["]Section 23.  <u>The legislature shall have the power to reserve marriage to opposite-sex couples.</u>"
>
> SECTION 3.  The question to be printed on the ballot shall be as follows:
>
> <u>"Shall the Constitution of the State of Hawaii be amended to specify that the legislature shall have the power to reserve marriage to opposite-sex couples?"</u>

1997 Haw. Sess. Laws H.B. No. 117 at 1246 (emphases added).

The question that appeared on the ballot at the 1998

election pursuant to HB 117 was identical to that proposed in the

bill:  "Shall the Constitution of the State of Hawaiʻi be amended

to specify that the legislature shall have the power to reserve

32

marriage to opposite-sex couples?" The language that was added to the Hawaiʻi Constitution as article I, section 23 was also identical to that proposed in the bill: "The legislature shall have the power to reserve marriage to opposite-sex couples." Haw. Const. art. I, § 23. Therefore, Representative McDermott's vote was not nullified: HB 117 was passed, the Hawaiʻi public voted in favor of the amendment, the constitution was amended as HB 117 provided, and the definition of marriage excluding same-sex couples in HRS § 572-1 was given full force and effect by this court in Baehr II.

Because Representative McDermott was able to exercise his right to vote for HB 117, his vote was counted in full, and he was on the winning side of the vote, Appellants cannot rely on any of the cases discussed above to support Representative McDermott's legislative standing.

Appellants' argument essentially boils down to the view that because the legislature in 2013 interpreted the language of HB 117 to allow it to enact the Marriage Equality Act--although Representative McDermott did not interpret it the same way when he cast his legislative vote for HB 117--Representative McDermott now has standing to challenge the Marriage Equality Act.

Even if we assume as true Appellants' allegation that in 1997 Representative McDermott believed he was voting for a measure that would prevent the legislature from redefining

33

marriage to include same-sex couples, Appellants' argument is misplaced.  A legislator's challenge to the subsequent interpretation of a law he or she voted for, as Representative McDermott does here, is a far cry from a legislator's vote being "nullified" as explained by the cases discussed above.  Representative McDermott's challenge to the Marriage Equality Act is even more attenuated than the "abstract dilution" of legislative power that was deemed an inadequate injury in Raines, and is clearly distinguishable from the direct nullification of votes that were deemed adequate injuries in Coleman, or the denial of the constitutionally recognized power of advise and consent that was at issue in Hanabusa.

Representative McDermott also contends that a New York case, Silver v. Pataki, 755 N.E.2d 842 (N.Y. 2001), supports his standing argument.  Silver states that a legislator's "responsibility necessarily includes continuing concern for protecting the integrity of one's votes and implies the power to challenge in court the effectiveness of a vote that has allegedly been unconstitutionally nullified."  Id. at 846.  In Silver, the plaintiff, a member and speaker of the New York State Assembly, brought an action against the Governor of New York alleging that the governor had unconstitutionally vetoed line items in a non-appropriations bill that the plaintiff had voted on.  Id. at 844-45.  The court held that the situation was analogous to that in

34

Coleman, and that "[a]s a Member of the Assembly who voted with the majority in favor of the budget legislation, [the] plaintiff undoubtedly has suffered an injury in fact with respect to the alleged unconstitutional nullification of his vote sufficient to confer standing." Id. at 847-48.

In contrast to cases like Raines and Mottl, where the plaintiffs had no standing, the plaintiff in Silver "won the legislative battle and . . . [sought] to uphold that legislative victory against a claimed unconditional use of the veto power nullifying his vote." Id. at 848. In other words, absent the allegedly unconstitutional veto in Silver, the bill the plaintiff voted for would have become law, whereas in Raines and Mottl, the plaintiffs were simply attempting to challenge bills on the basis that they had voted no, but had lost in the vote count. Silver is thus distinguishable from the present case. Like the plaintiff in Silver, Representative McDermott was on the winning side of the legislative vote for HB 117 in 1997, but unlike the plaintiff in Silver, Representative McDermott's vote was never vetoed or nullified in any way because the proposed question in HB 117 appeared on the 1998 ballot in the exact form Representative McDermott had voted for.[11]

---

[11] In addition, if we were to hold that Representative McDermott has standing to challenge the interpretation of a law that he voted for sixteen years ago, solely on the basis that he voted for it and without any other individualized injury, we would open the door to legislator suits against both judicial and agency interpretations of any laws that a legislator has voted

(continued...)

35

Appellants also rely on the recent U.S. Supreme Court decision in United States v. Windsor, 133 S.Ct. 2675 (2013). Appellants argue that Windsor is supportive because in Windsor the U.S. Supreme Court allowed the Bipartisan Legal Advisory Group (BLAG), a group consisting solely of members of Congress, to intervene to defend the federal Defense of Marriage Act (DOMA), but did not require BLAG's members to show that they had voted for DOMA or that their votes were "nullified." Contrary to Appellants' assertion, Windsor does not support their standing arguments.

In Windsor, the plaintiff, a private individual, challenged DOMA, claiming that DOMA's definition of marriage unconstitutionally denied tax benefits to same-sex couples. Id. at 2682-83. The executive branch agreed with Windsor that DOMA was unconstitutional and thus refused to defend the constitutionality of the law. Id. at 2683. BLAG then intervened in the lawsuit to defend DOMA. Id. at 2684. On appeal to the Supreme Court, amicus curiae challenged BLAG's standing to appeal the case. Id. at 2685. Although the Supreme Court recognized that the arguments raised against BLAG's standing raised a substantial question, the court found that BLAG had standing

---

[11](...continued)
on. Under such a precedent, a legislator would be able to establish standing no matter how long ago the vote occurred, simply by alleging that he or she "believed" he or she had voted for a different interpretation.

36

based on the "unusual and urgent" circumstances of the case. Id. at 2688. In particular, the Court noted that if it were to dismiss the case, extensive litigation would ensue, district courts in ninety-four districts would be without guidance, and the "[r]ights and privileges of hundreds of thousands of persons would be adversely affected, pending a case in which all prudential concerns about justiciability are absent." Id.

Appellants' reliance on Windsor is misplaced. The standing issue in Windsor did not involve whether a legislator who voted for a bill had standing to challenge (or defend) a law because the legislator's vote was allegedly nullified, as Representative McDermott is arguing here. BLAG was not seeking standing on the basis that its members voted for DOMA and were defending the law to preserve the validity of their votes. Instead, the standing issue in Windsor was whether the parties were still adverse given the executive branch's agreement with Windsor's legal position and decision not to defend DOMA, and BLAG's intervention on behalf of the executive branch. Id. at 2685. According to the amicus curiae, the case should have ended once the district court found DOMA to be unconstitutional and ordered the United States to pay the tax refund to Windsor, because the parties were no longer adverse and were both, in effect, prevailing parties. Id. The amicus curiae thus asserted that BLAG did not have standing to intervene and appeal from the

37

district court's judgment because there was no party aggrieved by the judgment. Id. Windsor is thus inapposite to the case at bar. Representative McDermott is not seeking to intervene to defend a law because the State of Hawaiʻi is refusing to do so, or appeal from a judgment where there are no aggrieved parties, but is simply challenging the validity of a law on his own behalf. Appellants' reliance on Windsor to establish Representative McDermott's standing is therefore unpersuasive.

Thus, Representative McDermott has alleged no injury-in-fact based on his status as a legislator who voted for HB 117. Appellants' argument for legislative standing fails at part one of the three-part test because Representative McDermott has not suffered any actual or threatened individual injury as a result of Appellees' wrongful conduct. See Sierra Club v. Dep't of Transp., 115 Hawaiʻi at 319, 167 P.3d 292 at 312.

3. **Appellants Have not Shown an Injury-in-Fact Based on Their Allegation That They Were Misled as to the Meaning of the 1998 Marriage Amendment**

The Individual Plaintiffs argue that the Marriage Equality Act nullified their votes on the 1998 ballot, so they suffered an "actual and personal injury" that supports standing. Appellants contend that the State engaged in a "bait and switch" tactic, and that this is the basis upon which the circuit court found standing.

Appellants' argument is that the voters were misled

into believing that they were voting for a constitutional amendment that would prevent the legislature from later enacting a law to recognize same-sex marriage without another constitutional amendment, because one part of the Ballot Information Flyer and the fact sheet was different from the actual ballot question.  The Ballot Information Flyer and the fact sheet that the State circulated prior to the 1998 election stated:  "A 'Yes' vote would add a new provision to the Constitution that would give the legislature the power to reserve marriage to opposite-sex couples <u>only</u>," (emphasis added), while the question on the actual ballot was:  "Shall the Constitution of the State of Hawaiʻi be amended to specify that the legislature shall have the power to reserve marriage to opposite-sex couples?"  Notably, however, both the fact sheet and the flyer also included the actual verbatim text of the ballot question, which did not include the word "only."

To recap, the first part of the three-part standing test requires the plaintiff to show that he or she has suffered an actual or threatened injury as a result of the defendant's wrongful conduct.  <u>Sierra Club v. Dep't of Transp.</u>, 115 Hawaiʻi at 319, 167 P.3d 292 at 312.  Appellants have not satisfied this requirement.  Appellants' bare factual allegations may allege an "injury," but Appellants have not provided sufficient evidence to support their allegations.  Moreover, even if we were to assume

that Appellants' allegations are true, any such injury is not a result of the Appellees' conduct.

Hawaiʻi voters have a legitimate interest in protecting the validity of their votes on constitutional amendment ballot questions. While this court has not specifically addressed the standing of voters to challenge defects in constitutional amendment ballots, it has decided such cases on the merits. For example, in Watland v. Lingle, this court exercised jurisdiction and ruled on the merits of a challenge to the validity of a constitutional amendment where registered voters alleged that the State had not complied with requirements regarding publication and disclosure of the amendment text and had provided voters with misinformation regarding the amendment. 104 Hawaiʻi 128, 130, 135-36, 85 P.3d 1079, 1081, 1086-87 (2004).

Similarly, in Kahalekai v. Doi, this court decided on the merits a case in which voters challenged constitutional amendments on two grounds. First, the plaintiffs alleged that the ballot questions were in a form that "contained an inherent bias towards a 'yes' vote." 60 Haw. 324, 332, 590 P.2d 543, 549, (1979). Second, the plaintiffs alleged that, although the Constitutional Convention's informational supplement stated that "the complete text of the constitutional amendments is contained in this supplement," the supplement did not in fact contain the exact text of the amendments because the Constitutional

FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER

Convention altered the language of the amendments before they appeared on the ballots.  Id. at 340-41, 590 P.2d at 554.

Here, although part of the explanations on the fact sheet and the Ballot Information Flyer did include the word "only," the fact sheet and the flyer both also included the verbatim text that appeared on the ballot sheet (without the word "only"), and this was the same language that was ultimately added as article I, section 23.  Further, the addition of the word "only" in the explanations does not appear to change the meaning of the text in the amendment.

Moreover, even if Appellants' allegations could, under Watland and Kahalekai, amount to a legally cognizable injury based on their interest in their votes on the 1998 ballot, Appellants' bare factual allegations are insufficient.  This case was decided at the summary judgment stage, so Appellants were required to set forth facts demonstrating their standing.[12]

---

[12]     Although, at the pleading stage, general factual allegations may be sufficient to establish standing, Appellants bear the burden of proof for each of the injury-in-fact elements, commensurate with the degree of evidence required at each successive stage of litigation.  Sierra Club v. Hawai'i Tourism Auth., 100 Hawai'i at 250-51, 59 P.3d at 885-86 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  This case proceeded to the summary judgment stage, so Appellants, as the party responding, were required to demonstrate "specific facts showing that there is a genuine issue for trial."  HRCP Rule 56(e).  At the summary judgment stage, we may consider affidavits submitted opposing the motion for summary judgment.  Sierra Club v. Hawai'i Tourism Auth., 100 Hawai'i at 251, 59 P.3d at 886.

Attached to Appellants' response to the MSJ in this case were declarations by Hashimoto, which stated:  "I voted in 1998 to amend the Hawai'i Constitution which gave the Legislature only power to reserve marriage for opposite-sex couples," Langdon, which stated:  "In 1998, I voted for our Hawai'i Constitution being amended with the understanding that this would make
(continued...)

However, Appellants have not provided evidence that the Individual Plaintiffs were misled.  Although the declarations of the Individual Plaintiffs show that Hashimoto, Langdon, and Kumia all voted on the 1998 ballot under the belief that a "yes" vote would only allow marriage in Hawaiʻi to be between opposite-sex couples, none of the declarations state that any of the three Individual Plaintiffs relied upon or even read the Ballot Information Flyer or the Office of Elections' fact sheet that Appellants claim misled the voters.  Thus, Appellants presented no evidence at the summary judgment stage of the proceedings to show that any of the Individual Plaintiffs were actually misled.

Furthermore, even if Appellants had provided enough evidence to establish an injury under the first prong, they could not rely on this alleged injury to challenge the Marriage Equality Act because such injury is not a result of Appellees' conduct.  There is a disconnect between the allegedly wrongful conduct--the alleged "bait and switch" in 1998--and the identity and conduct of Appellees in this case.  The parties that Appellants have sued as defendants in this case--the Governor and Director of Health--are responsible for signing the Marriage Equality Act into law in 2013 and issuing marriage licenses,

_____

[12](...continued)
same-sex marriages illegal under our Constitution," and Kumia, which stated: "I voted in 1998 to amend the Hawaiʻi Constitution by adding in new section to only allow marriage in Hawaiʻi to be between one man and one woman."

respectively, but they are not the parties responsible for the alleged misleading of voters on the 1998 ballot. To seek a remedy for this injury that occurred in 1998, Appellants would have needed to sue the State of Hawaiʻi Office of Elections.

This flaw in Appellants' allegation also causes the alleged injury to fail at the second part of the three-part test. Appellants have not demonstrated sufficient causation because the Individual Plaintiffs' alleged injury is not "fairly traceable" to Appellees' actions.

As noted above, the Appellees in this case are not the parties responsible for the alleged "bait and switch" upon which Appellants' "injury" is based. If Appellants had sued the parties responsible for allegedly misleading Appellants on the 1998 ballot, we would be required to determine whether there was a sufficient "logical nexus" between the Appellees' conduct (misleading voters in 1998) and Appellants' alleged injury (the enactment of the Marriage Equality Act). See Sierra Club v. Hawaiʻi Tourism Auth., 100 Hawaiʻi at 253, 59 P.3d at 888 (requiring members of the Sierra Club to show a "logical nexus" between the defendant's expenditure of funds and the injuries the members alleged). Although the link between the alleged "bait and switch" and the enactment of the Marriage Equality Act seems somewhat speculative, we need not determine whether there is sufficient causation to be "fairly traceable" because here, it is

43

clear that Appellees are not the parties responsible for allegedly misleading Appellants on the 1998 ballot.

Moreover, even if Appellants had met the first two prongs of the test, in regard to the third prong, Appellants have not established that "'a favorable decision would likely provide relief for the [their] injur[ies].'" Sierra Club v. Dep't of Transp., 115 Hawaiʻi at 319, 167 P.3d 292 at 312 (quoting Mottl, 95 Hawaiʻi at 389, 23 P.3d at 724). The Individual Plaintiffs, as voters on the 1998 ballot, are seeking a remedy that is not available to them. Appellants allege that "because the State engaged in a 'bait and switch' tactic, to the detriment of the Individual Plaintiffs, they have certainly demonstrated an injury in fact." Even if Appellants suffered an injury, this is only true as to the 1998 ballot question. Accordingly, as in Watland and Kahalekai, Appellants would arguably have standing to challenge the validity of the amendment they voted on, i.e. the 1998 marriage amendment. However, that is not the law that they are challenging here. Rather, they are challenging the Marriage Equality Act, which was adopted sixteen years later.

Accordingly, Appellants have not shown an injury that a favorable decision in this case would address, and therefore fail the third part of the standing test.

44

4.    **Appellants Do Not Have Standing Based on Their Allegation That the Marriage Equality Act Unconstitutionally Expanded the Meaning of Article I, Section 23**

Appellants argue that the Marriage Equality Act unconstitutionally expands the meaning of article I, section 23 in a way contrary to what they voted for, thereby nullifying their votes and injuring them, and that this was the grounds on which the circuit court found that Appellants had standing. Effectively, Appellants allege that the Marriage Equality Act is facially unconstitutional because it violates their understanding of article I, section 23.

To have standing to challenge the constitutionality of a statute, "[t]he general rule is that '[w]here restraints imposed act directly on an individual or entity and a claim of specific present objective harm is presented, standing to challenge the constitutionality of an ordinance or statute exists.'" State v. Armitage, 132 Hawaiʻi 36, 55, 319 P.3d 1044, 1063 (2014) (quoting State v. Bloss, 64 Haw. 148, 151, 637 P.2d 1117, 1121 (1981)). Further, to have standing, "[o]ne must show that as applied to him [or her] the statute is constitutionality invalid." Id.; City & Cnty. of Honolulu v. Ariyoshi, 67 Haw. 412, 419, 689 P.2d 757, 763 (1984).

Appellants' argument for standing on this basis is without merit. In the same way that Representative McDermott's

45

vote for HB 117 was not nullified by the enactment of the Marriage Equality Act, neither have the Individual Plaintiffs' votes in 1998 been nullified. There is no allegation that Appellants' votes were not given full effect, or that the 1998 marriage amendment that the Individual Plaintiffs voted for was not enacted into law. The legislature's enactment of a statute cannot constitute an injury-in-fact to grant standing to general election voters who voted on a related proposed constitutional amendment years earlier.

Thus, Appellants do not have standing based on their contention that the Marriage Equality Act unconstitutionally expanded the meaning of article I, section 23.

Finally, we note that, in addition to their argument for standing based on their status as voters on the 1998 marriage amendment, before the circuit court, Appellants argued that the Individual Plaintiffs had standing based on alleged injuries resulting directly from the enactment of the Marriage Equality Act, as articulated in their declarations. Appellants have not pursued this argument in their submissions to this court, and counsel for Appellants explicitly stated at oral argument that Appellants were not relying on these alleged injuries to establish standing. See Oral Argument at 21:28-22:25; 23:00-23:33, McDermott v. Ige, No. SCWC-14-0000843, available at http://state.hi.us/jud/oa/14/SCOA_121814_14_843.mp3. We

46

therefore do not address this argument here.[13]

Because the Marriage Equality Act has not nullified Appellants' votes, and Appellants have not alleged any way in which the Marriage Equality Act is constitutionally invalid as applied to them, we hold that the circuit court erred in finding that Appellants had standing to pursue this claim.

## IV.  Conclusion

Because Appellants lacked standing to pursue the present action, we vacate the circuit court's order granting summary judgment in favor of Appellees and against Appellants, and remand the case to the circuit court with instructions to enter an order dismissing the first amended complaint for lack of jurisdiction.

| | |
|---|---|
| Robert K. Matsumoto and Shawn A. Luiz for appellants | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Deirdre Marie-Iha and Donna H. Kalama for appellees | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |
| | /s/ Jeannette H. Castagnetti |

---

[13]  We note, however, that courts in other jurisdictions, when addressing the merits of challenges to bans on same-sex marriage, have rejected the notion that allowing same-sex couples to marry might harm other members of the public.  For example, the Seventh Circuit held that "while many heterosexuals . . . disapprove of same-sex marriage, there is no way they are going to be hurt by it in a way that the law would take cognizance of." Baskin v. Bogan, 766 F.3d 648, 669 (7th Cir. 2014).  Further, the District Court for the Northern District of Florida held that "[t]hose who enter opposite-sex marriages are harmed not at all when others . . . are given the liberty to choose their own life partners and are shown the respect that comes with formal marriage."  Brenner v. Scott, 999 F.Supp.2d 1278, 1291 (N.D. Fl. 2014).